IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

SHAWN LUGER,                                      )     Case No.
5405 Tuckerman Lane, Apt. 514                     )
North Bethesda, MD 20852                          )
Derivatively on Behalf of FARMLAND                )     VERIFIED STOCKHOLDER DERIVATIVE
PARTNERS INC.,                                    )     COMPLAINT FOR VIOLATION OF
                                                  )     SECURITIES LAW, BREACH OF DUTY,
            Plaintiff,                            )     WASTE OF CORPORATE ASSETS, AND
                                                  )     UNJUST ENRICHMENT
                                                  )
      v.                                          )
                                                  )
PAUL A. PITTMAN                                   )     DEMAND FOR JURY TRIAL
Farmland Partners Inc.                            )
4600 South Syracuse Street, Suite 1450           )
Denver, CO 80237,                                 )
SERVE ON:                                         )
Cogency Global Inc.                               )
1519 York Road                                    )
Lutherville, MD 21093                             )
(Resident agent of Farmland Partners Inc., who    )
is appointed agent to receive service of process  )
pursuant to Section 6-102.1 of the Cts. & Jud.    )
Proc. Article.),                                  )
                                                  )
LUCA FABBRI                                       )
11421 Marks Drive                                 )
Conifer, CO 80433,                               )
                                                  )
CHRIS A. DOWNEY                                   )
Farmland Partners Inc.                            )
4600 South Syracuse Street, Suite 1450           )
Denver, CO 80237,                                 )
SERVE ON:                                         )
Cogency Global Inc.                               )
1519 York Road                                    )
Lutherville, MD  21093                            )
(Resident agent of Farmland Partners Inc., who    )
is appointed agent to receive service of process  )
pursuant to Section 6-102.1 of the Cts. & Jud.    )
Proc. Article.),                                  )
                                                  )
JAY B. BARTELS                                    )
Farmland Partners Inc.                            )

- 1 -

4600 South Syracuse Street, Suite 1450 )
Denver, CO 80237, )
SERVE ON: )
Cogency Global Inc. )
1519 York Road )
Lutherville, MD 21093 )
(Resident agent of Farmland Partners Inc., who )
is appointed agent to receive service of process )
pursuant to Section 6-102.1 of the Cts. & Jud. )
Proc. Article.), )
)
JOSEPH W. GLAUBER )
Farmland Partners Inc. )
4600 South Syracuse Street, Suite 1450 )
Denver, CO 80237, )
SERVE ON: )
Cogency Global Inc. )
1519 York Road )
Lutherville, MD 21093 )
(Resident agent of Farmland Partners Inc., who )
is appointed agent to receive service of process )
pursuant to Section 6-102.1 of the Cts. & Jud. )
Proc. Article.), )
)
JOHN A. GOOD )
Farmland Partners Inc. )
4600 South Syracuse Street, Suite 1450 )
Denver, CO 80237, )
SERVE ON: )
Cogency Global Inc. )
1519 York Road )
Lutherville, MD 21093 )
(Resident agent of Farmland Partners Inc., who )
is appointed agent to receive service of process )
pursuant to Section 6-102.1 of the Cts. & Jud. )
Proc. Article.), )
)
ROBERT L. COWAN )
Farmland Partners Inc. )
4600 South Syracuse Street, Suite 1450 )
Denver, CO 80237, )
SERVE ON: )
Cogency Global Inc. )
1519 York Road )
Lutherville, MD 21093 )
)

- 2 -

(Resident agent of Farmland Partners Inc., who )
is appointed agent to receive service of process )
pursuant to Section 6-102.1 of the Cts. & Jud. )
Proc. Article.), )
)
DARELL D. SARFF )
Farmland Partners Inc. )
4600 South Syracuse Street, Suite 1450 )
Denver, CO 80237, )
SERVE ON: )
Cogency Global Inc. )
1519 York Road )
Lutherville, MD  21093 )
(Resident agent of Farmland Partners Inc., who )
is appointed agent to receive service of process )
pursuant to Section 6-102.1 of the Cts. & Jud. )
Proc. Article.), )
)
JOHN C. CONRAD )
23561 N. Sanctuary Club Drive )
Kildeer, IL 60047, )
)
THOMAS S.T. GIMBEL )
Farmland Partners Inc. )
4600 South Syracuse Street, Suite 1450 )
Denver, CO 80237, )
SERVE ON: )
Cogency Global Inc. )
1519 York Road )
Lutherville, MD  21093 )
(Resident agent of Farmland Partners Inc., who )
is appointed agent to receive service of process )
pursuant to Section 6-102.1 of the Cts. & Jud. )
Proc. Article.), )
)
D. DIXON BOARDMAN )
Farmland Partners Inc. )
4600 South Syracuse Street, Suite 1450 )
Denver, CO 80237, )
SERVE ON: )
Cogency Global Inc. )
1519 York Road )
Lutherville, MD  21093 )
(Resident agent of Farmland Partners Inc., who )
is appointed agent to receive service of process )

- 3 -

pursuant to Section 6-102.1 of the Cts. & Jud.   )
Proc. Article.),                                 )
                                                 )
                     Defendants,                 )
                                                 )
      -and-                                      )
                                                 )
FARMLAND PARTNERS INC.,                          )
a Maryland Corporation,                          )
4600 South Syracuse Street, Suite 1450           )
Denver, CO 80237,                                )
SERVE ON RESIDENT AGENT:                         )
Cogency Global Inc.                              )
1519 York Road                                   )
Lutherville, MD  21093                           )
                                                 )
                     Nominal Defendant.          )

---

Plaintiff Shawn Luger ("Plaintiff"), by his attorneys, submits this Verified Stockholder

Derivative Complaint for Violation of Securities Law, Breach of Duty, Waste of Corporate Assets,

and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the

allegations specifically pertaining to Plaintiff, which are based on personal knowledge.  This

complaint is also based on the investigation of Plaintiff's counsel, which included, among other

things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and

a review of news reports, press releases, and other publicly available sources.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal

defendant Farmland Partners Inc. ("Farmland Partners," "FPI," or the "Company") against certain

of its current and former officers and directors for violation of securities law, breach of duty, waste

of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in hundreds

of millions of dollars in damages to Farmland Partners' reputation, goodwill, and standing in the

#3370848v.1

business community. Moreover, these actions have exposed Farmland Partners to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Farmland Partners is a Real Estate Investment Trust ("REIT") that owns, acquires, and finances farmland in North America. With a portfolio consisting of approximately 166,000 acres spanning across seventeen states, according to its filings with the SEC, the Company is the largest public farmland REIT in the country.

3.      While the Company's principal business is renting out farmland to farmers, in 2015, Farmland Partners expanded its business with the inception of a loan program (the "FPI Loan Program"). The FPI Loan Program's stated purpose was to grant loans to "third-party farmers." Instead, certain of the Individual Defendants (as defined herein) misused the FPI Loan Program to grant a series of undisclosed loans to related parties. In fact, the beneficiaries of at least 70% of the total money loaned through the FPI Loan Program were individuals with intimate ties to Farmland Partners, including Jesse J. Hough ("Hough") and Ryan B. Niebur ("Niebur"). Hough was Farmland Partners' cofounder, an integral Company consultant, and the longtime business associate of Farmland Partners' Chief Executive Officer ("CEO"), defendant Paul A. Pittman ("Pittman"). Niebur was a part of the Company's small-size management and a longtime coworker of defendant Pittman and Farmland Partners' Chief Financial Officer ("CFO"), defendant Luca Fabbri ("Fabbri").

4.      Related-party transactions are inherently riskier because, unlike transactions with third parties, they are oftentimes not negotiated at arm's-length. Accordingly, U.S. Generally Accepted Accounting Principles ("GAAP") requires companies to disclose the details of related-party transactions. As could be expected, the risks associated with the Company's related-party

loans materialized to Farmland Partners' detriment, as several of the loans were either renegotiated, wrapped into new loans, or the borrower (in Niebur's case) went bankrupt.

5.      Instead of informing the public about the details of the related-party loans, between November 12, 2015 and July 10, 2018, the Individual Defendants disseminated a series of false and misleading statements concerning the FPI Loan Program in the Company's public filings with the SEC. Specifically, the Individual Defendants repeatedly claimed Farmland Partners granted loans to "third-party farmers." The Individual Defendants also routinely emphasized the due diligence conducted in connection with the FPI Loan Program, representing that loans would be granted based on a borrower's ability to pay. In reality, the primary criteria was whether the individual was a friend or business associate, regardless of the related-party's financial status or ability to satisfy their obligations to the Company. In addition, defendants caused or allowed the Company to misrepresent its compliance with GAAP and the effectiveness of its internal controls.

6.      On January 26, 2018, after receiving millions of dollars in loans from the Company, Niebur filed for Chapter 12 bankruptcy. Niebur's bankruptcy petition lists Farmland Partners as a creditor, highlighting the risks to which the Individual Defendants had recklessly exposed the Company.

7.      Then, on July 11, 2018, the truth about Farmland Partners' years-long loan practice finally emerged, as *Seeking Alpha* published a report conducted by investment analyst Rota Fortunae (the "Rota Fortunae Report").[1] Rota Fortunae's well-documented report is replete with evidence detailing the true nature of the FPI Loan Program, explaining that most of the loans were

---

[1] "Rota Fortunae" which translates to "Wheel of Fortune," is the pseudonym of an investment analyst who, according to *Seeking Alpha*, "[h]ighlights risks in capital markets by reporting in depth research." Rota Fortunae specializes in forensic accounting and investigative research. His or her true identity remains unknown.

issued to at least two related parties, Niebur and Hough. The Rota Fortunae Report also exposes the risks associated with the Company's related-party loans by furnishing evidence of the loans being defaulted, renegotiated, and wrapped into new loans. Further, the report divulges Niebur's bankruptcy.

8.     In the wake of the Rota Fortunae Report's publication, Farmland Partners' common stock and preferred stock plunged more than 38% and 26%, respectively, erasing over $110 million and $38 million, respectively, in market capitalization in a single day.

9.     On July 17, 2018, Farmland Partners attempted to control the damage resulting from the Rota Fortunae Report by issuing a press release purporting to rebut its claims. In the press release, the Individual Defendants falsely assert that neither Niebur nor Hough is a related party. The Individual Defendants further claim that they believe the loans to Niebur—who had filed for bankruptcy—are "good loans and will perform well for the Company." Less than two months earlier however, on May 24, 2018, affiliates of Farmland Partners filed an objection to Niebur's proposed bankruptcy reorganization (pursuant to which one of his leases with the Company would be assigned to an entity controlled by Niebur) based on Farmland Partners' assertion that Niebur failed to demonstrate his ability to satisfy the payments.

10.    On July 23, 2018, Farmland Partners further reacted to the Rota Fortunae Report by suing Rota Fortunae (whose true name is unknown) for defamation, disparagement, and intentional interference with prospective business relations, among other claims (the "Defamation Lawsuit").

11.    The Individual Defendants' unsuccessful efforts to discredit the report are only increasing the costs borne by the Company as a result of defendants' wrongdoing. Farmland Partners' Annual Report on Form 10-K, for the year ended December 31, 2018, filed with the SEC

on March 15, 2019, discloses legal and accounting expenses of $2.33 million, representing over a 60% increase from the previous year. Farmland Partners explained that these increased expenses were "primarily attributable to increased costs related to litigation for the Rota Fortunae matter."

12.    Further, as a direct result of this unlawful course of conduct, Farmland Partners is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the District of Colorado[2] on behalf of investors who purchased Farmland Partners' shares (the "Securities Class Action"). The Securities Class Action asserts claims against the Company and defendants Pittman and Fabbri in connection with Farmland Partners' improper statements concerning related-party transactions and the FPI Loan Program, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

13.    On June 18, 2019, Judge David M. Ebel ("Judge Ebel") denied the Securities Class Action defendants' motion to dismiss the Securities Class Action. In denying these defendants' motion, Judge Ebel found that the plaintiffs adequately alleged—under the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA")—that the defendants made false and misleading statements and omissions concerning related-party loans and due diligence for the FPI Loan Program establishing a "strong inference of scienter." Judge Ebel further rejected the Securities Class Action defendants' argument that these misstatements were not material, noting that "[a] reasonable shareholder would undoubtedly consider it important to know whether Farmland had created a sham loan program to help the directors' friends or created a legitimate new source of revenue." The

---

[2] *The Turner Insurance Agency, Inc., et al. v. Farmland Partners Inc. et al.* (Civil Action No. 18-cv-02104) (D. Colo.)

Securities Class Action will now engage in discovery, significantly increasing damage to Farmland Partners.

16. The Company has also been harmed as a result of the Director Defendants' (as defined herein) actions in causing the Company to repurchase over $16.5 million worth of Farmland Partners stock at artificially inflated prices while concealing the Company's risky related-party loans and misrepresenting Farmland Partners' financial results and future prospects.

15. On April 25, 2019, Plaintiff's counsel sent a litigation demand (the "Demand") to Farmland Partners' Board of Directors (the "Board") demanding that the Board investigate the foregoing facts and claims, and to address, remedy, and commence proceedings against the corporate fiduciaries responsible for damaging the Company. On August 1, 2019, Plaintiff received a letter informing him that the Board had rejected the Demand. The Board's rejection letter demonstrates an utter lack of good faith and a complete failure to conduct an investigation, let alone any reasonable investigation, into the allegations contained in Plaintiff's Demand. Further, even if the required reasonable investigation had been undertaken, the Board lacked independence in deciding to reject Plaintiff's Demand insofar as it was made without isolating conflicted members of the Board. This decision was further tainted by the guidance of conflicted counsel who could not, and did not, objectively evaluate the Demand's allegations. Because the Board failed to act in good faith and with due care (on the basis of a reasonable investigation), its decision to refuse Plaintiff's Demand was wrongful and is not protected by the business judgment rule.

16. In light of the Board's refusal to act, Plaintiff brings this action to remedy the harm caused by defendants' wrongful actions.

#3370848v.1

## JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.  In addition, pursuant to §§ 6-102.1 of the Courts and Judicial Proceedings Article of the Maryland Code Annotated, this Court has jurisdiction over the Director Defendants who served as directors of Farmland Partners on or after October 1, 2017, and who are deemed to have consented to the appointment of the resident agent of Farmland Partners as an agent on which service of process may be made in any civil action brought in this State against those Director Defendants for an "internal corporate claim" as defined in § 1-101 of the Corporations and Associations Article.

19.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in, maintains executive offices in, or is incorporated in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of their duties owed to Farmland Partners, occurred in this District; and/or (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

#3370848v.1

20.     Further, pursuant to the Company's Second Amended and Restated Bylaws effective November 8, 2017, the exclusive forum for any derivative action or proceeding brought on behalf of the Company is the Circuit Court for Baltimore City, Maryland, or, if that Court does not have jurisdiction, the United States District Court for the District of Maryland, Baltimore Division.

## THE PARTIES

**Plaintiff**

21.     Plaintiff has continuously been a Farmland Partners stockholder since November 2016.

**Nominal Defendant**

22.     Nominal Defendant Farmland Partners is a Maryland corporation with principal executive offices located at 4600 South Syracuse Street, Suite 1450, Denver, Colorado.  Farmland Partners is a REIT that manages a portfolio of farmland and land with agricultural development potential spanning approximately 162,000 acres across seventeen states.  Substantially all of the Company's assets and operations are held by and conducted through its consolidated subsidiaries, including Farmland Partners Operating Partnership, L.P. (the "Operating Partnership").  Farmland Partners is the sole member of the Operating Partnership's general partner, and owned 93.2% of the Operating Partnership's outstanding common units as of March 15, 2019.  As of March 8, 2019, Farmland Partners had thirteen employees.

**Defendants**

23.     Defendant Pittman is Farmland Partners' President and has been since May 2018, and CEO and has been since April 2014.  Defendant Pittman is also a Farmland Partners' director and has been since April 2014.  Defendant Pittman was also Farmland Partners' President from

April 2014 to February 2017. Defendant Pittman is named as a defendant in the Securities Class

Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant

Pittman knowingly, recklessly, or with gross negligence approved Farmland Partners' related-party

loans. Defendant Pittman also knowingly, recklessly, or with gross negligence made improper

statements in Farmland Partners' press releases and public filings concerning the Company's: (i)

FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv)

effectiveness of its internal controls. Defendant Pittman breached the duties he owed to the

Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated

thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he

knew were artificially inflated by his misleading statements and omissions. Farmland Partners

paid defendant Pittman the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2018 | $477,000 | - | $599,997 | $23,468 | $1,100,465 |
| 2017 | $477,000 | - | $648,852 | $62,694 | $1,188,546 |
| 2016 | $477,000 | $500,000 | $648,852 | $50,357 | $1,676,209 |
| 2015 | $432,083 | $300,000 | $650,000 | $42,755 | $1,424,838 |

24.     Defendant Fabbri is Farmland Partners' CFO and Treasurer and has been since

April 2014. Defendant Fabbri was also Farmland Partners' Secretary from April 2014 to at least

November 2016. Defendant Fabbri is named as a defendant in the Securities Class Action

complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Fabbri

knowingly, recklessly, or with gross negligence approved Farmland Partners' related-party loans.

Defendant Fabbri also knowingly, recklessly, or with gross negligence made improper statements

in Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan

Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its

internal controls. Defendant Fabbri breached the duties he owed to the Company and violated

- 12 -

section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Fabbri the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2018 | $275,000 | $122,472 | $249,999 | $5,713 | $653,184 |
| 2017 | $275,000 | - | $149,733 | $14,616 | $439,349 |
| 2016 | $275,000 | $250,000 | $149,733 | $20,678 | $695,411 |
| 2015 | $251,667 | $100,000 | $260,000 | $17,946 | $629,613 |

25.     Defendant Chris A. Downey ("Downey") is Farmland Partners' Lead Independent Director and has been since at least April 2016, and a director and has been since April 2014. Defendant Downey is also the Chairman of Farmland Partners' Audit Committee and has been since at least March 2015. Defendant Downey knowingly or recklessly approved Farmland Partners' related-party loans. Defendant Downey also knowingly or recklessly made improper statements in Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls. Defendant Downey breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Downey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2018 | $54,000 | - | $710 | $54,710 |
| 2017 | $41,250 | $46,765 | $2,045 | $90,060 |
| 2016 | $57,500 | - | $820 | $58,320 |
| 2015 | $50,500 | - | $1,292 | $51,792 |

- 13 -

26.     Defendant Jay B. Bartels ("Bartels") is a Farmland Partners director and has been since April 2014.  Defendant Bartels is also a member of Farmland Partners' Audit Committee and has been since at least March 2015.  Defendant Bartels knowingly or recklessly approved Farmland Partners' related-party loans.  Defendant Bartels also knowingly or recklessly made improper statements in Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls.  Defendant Bartels breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  Farmland Partners paid defendant Bartels the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $41,000 | - | $710 | $41,710 |
| 2017 | $31,750 | $46,756 | $2,045 | $80,551 |
| 2016 | $44,500 | - | $820 | $45,320 |
| 2015 | $44,000 | - | $1,292 | $45,292 |

27.     Defendant Joseph W. Glauber ("Glauber") is a Farmland Partners director and has been since February 2015.  Defendant Glauber is also a member of Farmland Partners' Audit Committee and has been since at least April 2016.  Defendant Glauber knowingly or recklessly approved Farmland Partners' related-party loans.  Defendant Glauber also knowingly or recklessly made improper statements in Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls.  Defendant Glauber breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he

- 14 -

knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Glauber the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $39,750 | - | $710 | $40,460 |
| 2017 | $30,000 | $46,765 | $2,045 | $78,810 |
| 2016 | $40,000 | - | $1,229 | $41,229 |
| 2015 | $39,250 | $35,836 | $1,192 | $76,278 |

28.     Defendant John A. Good ("Good") is a Farmland Partners director and has been since January 2018. Defendant Good knowingly or recklessly approved Farmland Partners' related-party loans. Defendant Good also knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls. Defendant Good breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Good the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $29,000 | $20,832 | $637 | $50,469 |

29.     Defendant Robert L. Cowan ("Cowan") was Farmland Partners' President from February 2017 to May 2018. Defendant Cowan knowingly or recklessly approved Farmland Partners' related-party loans. Defendant Cowan also knowingly, recklessly, or with gross negligence, made improper statements in Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls. Defendant Cowan breached the duties

- 15 -

he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Cowan the following compensation as an executive:

| Year | Salary | Bonus | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $300,000 | $165,000 | $33,523 | $498,523 |

30.     Defendant Darell D. Sarff ("Sarff") was a Farmland Partners director from April 2014 to January 2018. Defendant Sarff knowingly or recklessly approved Farmland Partners' related-party loans. Defendant Sarff also knowingly or recklessly made improper statements in Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls. Defendant Sarff breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Sarff the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $10,500 | - | $532 | $11,032 |
| 2017 | $33,250 | $46,765 | $2,045 | $82,060 |
| 2016 | $44,250 | - | $820 | $45,070 |
| 2015 | $40,500 | - | $1,292 | $41,792 |

31.     Defendant John C. Conrad ("Conrad") was a Farmland Partners director from March 2016 to August 2017. Defendant Conrad knowingly or recklessly approved Farmland Partners' related-party loans. Defendant Conrad also knowingly or recklessly made improper statements in Farmland Partners' press releases and public filings concerning the Company's: (i)

#3370848v.1

FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls. Defendant Conrad breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Conrad the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $27,000 | $30,889 | $1,073 | $58,962 |
| 2016 | $28,500 | $11,963 | $273 | $40,736 |

32.     Defendant Thomas S.T. Gimbel ("Gimbel") was a Farmland Partners director from February 2017 to May 2018. Defendant Gimbel knowingly or recklessly approved Farmland Partners' related-party loans. Defendant Gimbel also knowingly or recklessly made improper statements in Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls. Defendant Gimbel breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Gimbel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $25,500 | - | $356 | $25,856 |
| 2017 | $27,000 | $15,024 | $356 | $42,380 |

33.     Defendant D. Dixon Boardman ("Boardman") was a Farmland Partners director from February 2017 to December 2017. Defendant Boardman knowingly or recklessly approved Farmland Partners' related-party loans. Defendant Boardman also knowingly or recklessly made

improper statements Farmland Partners' press releases and public filings concerning the Company's: (i) FPI Loan Program; (ii) related-party transactions; (iii) compliance with GAAP; and (iv) effectiveness of its internal controls. Defendant Boardman breached the duties he owed to the Company and violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by causing Farmland Partners to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Farmland Partners paid defendant Boardman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $27,000 | $15,024 | $356 | $42,380 |

34.     The defendants identified in ¶¶23-24, 29 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶23, 25-28, 30-33 are referred to herein as the "Director Defendants." The defendants identified in ¶¶25-27 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶23-33 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**Duties of the Officer Defendants and Director Defendants**

35.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Farmland Partners certain duties and obligations.

36.     The Officer Defendants stood and stand in a fiduciary relationship to the Company bearing the same duties and obligations to the Company as an agent bears to his or her principal. In performing their responsibilities as officers of Farmland Partners, the Officer Defendants were and are required to exercise reasonable care and skill. The Officer Defendants owed Farmland Partners undivided and unselfish loyalty; they were and are required to act in furtherance of the best interests of Farmland Partners and not in furtherance of their personal interest or benefit. In

- 18 -

addition to these duties of care and loyalty, the Officer Defendants also owed the Company duties of good faith and candid disclosure.  By virtue of such duties, the officers of Farmland Partners were required to, among other things:

> (a)    place the interests of the Company above their own;

> (b)    refrain from competing with the Company;

> (c)    disclose all material information; and

> (d)    truthfully and accurately guide investors and analysts as to the business

operations of the Company at any given time.

37.    The Director Defendants were under a duty to exercise the standard of care for directors set forth in the Maryland General Corporation Law ("MGCL").  Under MGCL § 2-405.1, the Director Defendants are and were required to act in good faith, in a manner the director reasonably believes to be in the best interests of the Company, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

**Farmland Partners' Code of Business Conduct and Ethics and Code of Ethics for CEO and Senior Financial Officers**

38.    In addition, the Company has adopted a Code of Business Conduct and Ethics (the "Code") that applies to all employees, including officers and members of the Board.  The Code states that it "is designed to promote," among other things, "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships."  As to these conflicts of interest, the Code states:

**Conflicts of Interest**

A conflict of interest arises any time the personal interests of Company Personnel interfere with his, her or their ability to act in the best interests of the Company. All Company Personnel must discharge their responsibilities on the basis of what is in the best interest of the Company independent of personal considerations or relationships.

Company Personnel must disclose any potential conflicts of interest to the Chief Financial Officer or such officer's designees, who can advise the employee as to whether or not the Company believes a conflict of interest exists. Conflicts of interest may not always be clearcut, so Company Personnel are encouraged to bring questions about particular situations to the Chief Financial Officer or such officer's designees. Company Personnel should also disclose potential conflicts of interest involving the employee's spouse, siblings, parents, in-laws, children, life partner and members of the employee's household.

Conflicts of interest involving any member of the Board of Directors shall be addressed (i) by the Board of Directors or applicable committee thereof in accordance with policies and procedures followed by the Board of Directors from time to time, and (ii) in a manner that is consistent with the discharge by the members of the Board of Directors of their fiduciary duties.

39.     Farmland Partners has also adopted a "Code of Ethics for Chief Executive Officer and Senior Financial Officers," as of September 18, 2015 (the "Code of Ethics"). The Code of Ethics states that "[t]he Chief Executive Officer and Senior Financial Officers will exhibit and promote the highest standards of honest and ethical conduct." The Code of Ethics states that they shall:

- Conduct Company business in an ethical, moral and legal manner.

- Encourage and reward professional integrity in all aspects of the organization, including by eliminating inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal or alienation.

- Seek to avoid, eliminate and/or prevent the appearance or occurrence of conflicts of interest between what is in the best interest of the Company and what could result in material personal gain for a member of the organization, including the Chief Executive Officer and Senior Financial Officers.

- Work together and with others in the Company in order to provide a mechanism for members of the organization to inform senior management of deviations in practice from policies and procedures governing honest and ethical behavior.

- Demonstrate their personal support for honest and ethical conduct through periodic communication throughout the organization regarding the importance of such conduct to the Company.

#3370848v.1

40.     The Code of Ethics also has a specific provision for records and reports, which states that they will "manage the Company's transaction and reporting system and procedures, records and public disclosures" such that transactions are "properly authorized" and accurately recorded in accordance with GAAP.

41.     The Code of Ethics also states they shall "establish and maintain mechanisms to" among other things: (i) monitor and promote compliance with applicable laws; (ii) "[i]dentify, report ... and correct in a swift and certain manner, any detected deviations from applicable [laws], or [the] Code of Ethics"; and (iii) hold individuals accountable for deviations from applicable laws or the Code of Ethics.

**Additional Duties of the Audit Committee Defendants**

42.     In addition to these duties, under the Audit Committee Charter in effect since November 20, 2017, the Audit Committee Defendants— Downey, Bartels, and Glauber—owed specific duties to Farmland Partners to assist the Board in overseeing the Company's internal audit function, integrity of its financial statements, and system of internal controls. Assisting the Board's oversight over those internal controls extends to, "assur[ing] that there is in place an effective system of internal controls reasonably designed to ... [s]afeguard the assets and income of the Company" and "[m]aintain compliance with the Company's ethical standards, policies, plans and procedures, and with laws and regulations." Moreover the Audit Committee's Charter provides the Audit Committee is responsible for reviewing all related-party transactions. In addition, the Audit Committee Charter provides:

> The Committee shall also review the policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"), the New York Stock Exchange (the "NYSE"), and the applicable rules and regulations of the Securities and Exchange Commission (the "SEC").

**Breaches of Duties**

43.     The conduct of the Individual Defendants complained of herein exceeds the realm of sound business judgment and involves a violation of their obligations as officers and directors of Farmland Partners, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

44.     The Officer Defendants breached their duties of loyalty, good faith, and candid disclosure by allowing defendants to cause, or by themselves causing, the Company to disseminate improper statements to the public, unlawful practices that wasted the Company's assets, and caused Farmland Partners to incur substantial damage.

45.     The Director Defendants violated their obligations under MGCL § 2-405.1 to act in good faith, in a manner reasonably believed to be in the best interests of Farmland Partners, and with the care of an ordinary prudent person, by allowing defendants to cause, or by themselves causing, the Company to disseminate improper statements to the public, unlawful practices that wasted the Company's assets, and caused Farmland Partners to incur substantial damage.

46.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Farmland Partners' public statements and internal control function.

47.     Each of the Individual Defendants also failed to act in good faith and with appropriate care by causing or allowing Farmland Partners to repurchase its stock on the open market at prices the Individual Defendants knew were artificially inflated by their misleading statements and omissions.

#3370848v.1

48.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Farmland Partners, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Farmland Partners has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Farmland Partners, as to the Individual Defendants' management of the Company, and as to its operations, financial condition, related-party transactions, and noncompliance with laws, regulations, and policies; (ii) artificially inflate Farmland Partners' stock price while the Company repurchased its own stock; and (iii) enhance the Individual Defendants' executive and directorial positions at Farmland Partners and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

#3370848v.1

51.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements and operate with inadequate internal controls, risk management procedures, and other policies to alert them of the related-party transactions, or actively concealed the Company's loans to related parties.

52.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of securities law, breaches of duties, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS ISSUE SEVERAL LOANS TO UNDISCLOSED RELATED PARTIES

### GAAP Requires Farmland Partners to Disclose Related-Party Transactions

55.     GAAP requires corporations to include disclosures and descriptions of "related party transactions," including the nature of the relationship involved. Accounting Standards

Codification 850-10-50 ("ASC 850"). GAAP defines a related parties as those "with which the entity may deal if one party controls *or can significantly influence the management or operating policies* of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." ASC 850-10-20.

56.     Related-party transactions require disclosure because, unlike transactions with third parties, they are often not negotiated at arm's-length and therefore can present increased risks to a company. For example, a company may agree to more lenient or less favorable terms when transacting with related parties, which may subject a company to increased liability and future costs.

### Hough, Farmland Partners' Cofounder and Defendant Pittman's Long-Time Business Partner, Is a Related Party

57.     Hough is defendant Pittman's long-time business partner, who, in addition to cofounding Farmland Partners, also played a significant role in the Company's management. In 2012, Hough and defendant Pittman merged their personal farmland holdings to form Pittman Hough Farms LLC ("Pittman Hough Farms"). Defendant Pittman owned a 75% interest in Pittman Hough Farms while Hough and his family members owned the remaining 25%. In 2014, defendant Pittman and Hough spun the majority of their holdings in Pittman Hough Farms into Farmland Partners, which held its initial public offering ("IPO") in the same year.

58.     Before its IPO, Farmland Partners maintained that Hough was integral to forming and developing the Company's business strategy. Specifically, in a February 12, 2014 letter to the SEC, Farmland Partners stated:

> The Company respectfully advises the Staff that the Company has formulated its business strategy based on the extensive experience of Messrs. Pittman, Fabbri and Hough as owners of agricultural real estate and operators of farming businesses. While their views are informed by press articles, which provide additional perspectives and may influence some market participants, Messrs. Pittman, Fabbri and Hough develop the Company's strategies instead based on thoughtful analysis

- 25 -

of published data, market intelligence from expansive and strong relationships throughout the agricultural sector and actual experience of acquiring, operating and leasing farmland.

59.     On April 11, 2014, Farmland Partners held its IPO of 3.8 million shares at $13 per share. The Company had only two employees at the time of the IPO and currently has less than twenty. As such, Farmland Partners' employees and management worked closely together, giving them extensive knowledge over all aspects of the Company's business. Their intimate working relationship additionally gave them significant influence over one another.

60.     At the time of the IPO, Farmland Partners' business was renting farmland to farmers. Farmland Partners' IPO Prospectus provides that all of the Company's farms (except two) were rented to and operated by entities in which Hough held an interest, including Astoria Farms and Hough Farms. Astoria Farms was a partnership in which Pittman Hough Farms held a 33% partnership interest, Hough owned a 4.3% indirect interest, and limited partnerships in which defendant Pittman was the general partner owned the remaining interest. As for Hough Farms (a different entity than Pittman Hough Farms), defendant Pittman and Hough each held indirect partnership interests of 18.75% and 28.3%, respectively.

61.     Farmland Partners' IPO Prospectus holds out Astoria Farms and Hough Farms as related parties. The Company explained that Hough Farms was related because Hough held an interest in the entity and would provide consultancy services to the Company. In particular, the IPO Prospectus stated:

> Our principal source of revenue will be rent from tenants that conduct farming operations on our farmland. Upon completion of this offering, substantially all of the farmland in our initial portfolio will be leased to either Astoria Farms, which is controlled by Paul A. Pittman, our Executive Chairman, President and Chief Executive Officer, or **Hough Farms**, in which Mr. Pittman and Jesse J. **Hough, who will provide consulting services to us, have an interest**. See "Our Business and Properties—Description of Tenants." We refer to Astoria Farms and Hough Farms as our "related tenants" in this prospectus.

- 26 -

62.     Further cementing Hough's related-party status, Farmland Partners' IPO Prospectus stressed how important Hough's consultancy would be for the Company. Farmland Partners touted Hough's experience in the agricultural business while emphasizing that his consultancy would extend to virtually all aspects of the Company's business. The Prospectus further pointed out that Hough would be over a 5% stockholder in the Company. Specifically, the IPO Prospectus stated:

> Mr. Pittman, our Executive Chairman, President and Chief Executive Officer, and Luca Fabbri, our Chief Financial Officer, comprise our management team. In addition, *effective upon completion of this offering, we will enter into a consulting agreement with Jesse J. Hough, or the Consulting Agreement, pursuant to which Mr. Hough will advise us with respect to business strategies and related matters, including asset underwriting, asset acquisitions and accounting matters, as well as other matters reasonably requested by us during the term of the Consulting Agreement.* See "Management—Consulting Agreement." Mr. Hough was previously a partner of Kennedy and Coe, a top 100 accounting firm that focuses on agribusiness accounting, and has worked with Mr. Pittman since late 2011, when Messrs. Pittman and Hough agreed to merge their respective farmland and farming operations holdings. See "Our Business and Properties—Our Real Estate Experience." Messrs. Pittman, Fabbri and Hough have more than ten, three and ten years of experience, respectively, as owners of agricultural real estate and operators of farming businesses and collectively have consummated over 70 transactions to acquire and consolidate various farmland parcels. As a result, we believe Messrs. Pittman, Fabbri and Hough have a deeper understanding of agribusiness fundamentals and greater insight into factors affecting the value of farmland than many of our competitors. Upon completion of this offering and the formation transactions, *Mr. Pittman and Mr. Hough will own approximately 26.3% and 5.2%, respectively,* of the fully diluted equity interests in our company, which we believe aligns their interests with those of our stockholders.

63.     Farmland Partners considered Hough so important that the IPO Prospectus warned that losing him could have a material adverse effect on the Company's business. Moreover, Farmland Partners stated it was "dependent" on Hough and admitted that his consultancy agreement was not negotiated at arm's-length. In particular, the IPO Prospectus stated:

> *The loss of key management personnel, particularly Paul A. Pittman and Luca Fabbri, or the loss of Jesse J. Hough, our consultant, could have a material adverse effect on our ability to implement our business strategy and to achieve our investment objectives.*

Our future success depends to a significant extent on the continued service and coordination of our senior management team, particularly Paul A. Pittman, our Executive Chairman, President and Chief Executive Officer, and Luca Fabbri, our Chief Financial Officer. We can provide no assurances that any of our key personnel will continue their employment with us. The loss of services of any of our executive officers could have a material adverse effect on our ability to implement our business strategy and to achieve our investment objectives.

In addition, the success of the farm operator that will rent substantially all of our properties upon completion of this offering depends to a significant extent on the continued service of Jesse J. Hough, who manages the farming operations of our related tenants that will lease substantially all of the farms in our initial portfolio. ***The loss of services from Mr. Hough under the Consulting Agreement or his departure from or diminishment of his activities at our related tenants could have a material adverse effect on our business.***

*   *   *

The FP Land Merger Agreement, the Shared Services Agreement, the Consulting Agreement and certain other agreements entered into in connection with the formation transactions were not negotiated on an arm's-length basis, and we may pursue less vigorous enforcement of terms of those agreements because of conflicts of interest and our ***dependence*** on Messrs. Pittman, Fabbri and ***Hough***.

64.     Hough continued to consult for Farmland Partners until April 2018.

65.     Hough and defendant Pittman's extensive business relationship reaches beyond Farmland Partners as well.  In addition to holding and sharing business interests in the entities described above (i.e., Pittman Hough Farms, Astoria Farms, and Hough Farms), Hough and defendant Pittman were also fiduciaries together at Pine Ridge Holdings, Inc. ("Pine Ridge"), a Wyoming entity connected to the FPI Loan Program.  Hough and defendant Pittman are named as officers and directors in each of Pine Ridge's annual reports from 2013 through 2016.  In 2017, defendant Pittman was removed while Hough remained.  Then, in 2018, Pine Ridge again listed Hough and defendant Pittman as officers and directors in its application to transact business in Nebraska.

66.     Significantly, Pine Ridge is linked to one of the Company's loans to Hough.  As described more fully below, on August 25, 2017, the Company issued a $669,000 loan to Hough.

#3370848v.1

The $669,000 loan was secured by a property in Nebraska.  Three months earlier, on May 25, 2017, Hough Farms and Pine Ridge were listed as coborrowers on a deed of trust for a loan from a bank.  The bank loan was secured by the same Nebraska property that secured Farmland Partners' $669,000 loan to Hough.  On October 2, 2017, the bank reconveyed the deed of trust, indicating that Hough Farms and Pine Ridge had paid the May 25, 2017 loan.  It seems that Farmland Partners' August 25, 2017 loan was used by Hough to repay the May 25, 2017 loan on behalf of Hough Farms and Pine Ridge.  It further appears that Farmland Partners issued the $669,000 loan to Hough, despite the fact that the Nebraska property was already securing another loan for Pine Ridge (for which defendant Pittman was a fiduciary from 2013 to 2016, as well as in 2018).

67.     Hough and defendant Pittman also owned 25% and 5% interests, respectively, in American Agriculture Corporation, a Colorado entity.  In addition, the Company's CFO, defendant Fabbri, served alongside Hough and defendant Pittman as American Agriculture Corporation's senior vice president.

68.     Their inextricably woven business relationship implies that Hough had significant influence over defendant Pittman, and therefore Farmland Partners.  More importantly, in light of Farmland Partners' admitted dependence on Hough, his influence over the Company and its management is undeniable.  As a result, Hough is a related party under ASC 850.

**Niebur, a Former Manager of Farmland Partners and Close Associate of Defendants Pittman and Fabbri, Is Also a Related Party**

69.     Niebur, a former Company employee and close associate of defendants Pittman and Fabbri, is similarly a related party.  On its website in 2015, Farmland Partners listed Niebur as part of its management team under the title "Farm Manager (High Plains, Mountains)."  In the following year, Farmland Partners named Niebur the Company's "Director of Acquisitions & Management – High Plains," providing his contact information in conjunction.

70.     Farmland Partners continued to hold Niebur out as part of its management in a 2017 presentation from the Company's investor relations website.   In particular, the Company's presentation stated:

**Ryan Niebur,** *Farm Manager (High Plains, Mountains)*

Ryan is a fourth generation farmer from Eastern Colorado. After college, Ryan began his career by returning to his roots where he started his own family farm and agricultural retail business (Tri-County Ag Inc.). Although Ryan has pursued other interests in the agricultural industry, he still is involved in the daily operations of his family farm. He attended Colorado State University where he received a B.S. in Business Marketing.

71.     In addition, Niebur's LinkedIn profile states that he worked at Farmland Partners as "Director of Acquisitions | Farm Manager | Realtor" from September 2015 until January 2018.

72.     Niebur's status as a related party is further confirmed by the small size of Farmland Partners.  In light of the Company's modest employee and management base, as mentioned above, Niebur worked closely with management.  Due to this intimate work environment and in light of Niebur's important role as Director of Acquisitions, Niebur and the Company's management had significant influence over one another.

**The Individual Defendants Issue Dubious Related-Party Loans Through the FPI Loan Program**

73.     On August 27, 2015, the Company issued a press release announcing the launch of the FPI Loan Program.  In the press release, the Company described the FPI Loan Program as "an agricultural lending product aimed at farmers" that would "complement" Farmland Partners' business of acquiring and renting farmland.  The Company went on to explain that the program "addresses a market need created by short term cash flow pressure on farmers who otherwise maintain solid balance sheets."  To ensure principal protection, the Company assured investors that it intended to establish a "conservative loan-to-value criteria."

#3370848v.1

74.     Contrary to the Individual Defendants' claim that the FPI Loan Program filled a market need however, only a few unrelated individuals sought loans under the program. In reality, the FPI Loan Program's primary beneficiaries were related parties. In fact, at least five out of the total nine loans under the FPI Loan Program went to Hough and Niebur, accounting for $9.2 million, or 70%, of the total $15.4 million worth of loans issued by Farmland Partners.

75.     Although Farmland Partners listed the amounts of each of its nine loans in its public filings with the SEC, the Individual Defendants omitted the identities of the borrowers, including the names of Hough and Niebur, thereby disguising the Company's loans as third-party transactions. As a result, Farmland Partners concealed that these related-party loans were not negotiated at arm's-length and therefore presented increased risks and potential detriment to Farmland Partners. Indeed, these risks came to fruition and ultimately harmed the Company. As described below, several of Farmland Partners' loans to business associates were renegotiated, defaulted, wrapped into new loans, or threatened by the borrower's bankruptcy.

**The Individual Defendants Issue Undisclosed Loans to Niebur, Who Later Files for Bankruptcy**

76.     Beginning in 2015, the Individual Defendants caused Farmland Partners to enter into a variety of loan transactions with Niebur despite his inability to meet his financial obligations to the Company. On January 26, 2018, Niebur and his wife, Stacie Niebur, filed a bankruptcy petition under Chapter 12 in the U.S. Bankruptcy Court for the District of Colorado, which lists Farmland Partners as a creditor. As described below, Niebur's bankruptcy filings and other public records, including deeds, detail the unflattering truth about the FPI Loan Program.

77.     On October 30, 2015, Farmland Partners loaned $980,000 to an undisclosed borrower subsequently revealed to be Niebur. In public filings, Farmland Partners stated that the $980,000 loan was collateralized by a mortgage on farm real estate, and that its first year's interest

was due up front.  In addition to omitting Niebur's identity as the borrower and his related-party status, Farmland Partners also concealed that the loan would be used to pay off an existing mortgage with a bank rather than for the FPI Loan Program's claimed purpose of farming operations.  Niebur ended up defaulting on this loan.

78.     On March 16, 2017, Farmland Partners acquired the property used to collateralize Niebur's first loan, Andersons Farm, for $801,800.  Andersons Farm's deed specifically provides that Niebur defaulted on his first loan and was required to pay a remaining balance of $240,000.  Court records from Niebur's bankruptcy reveal the remaining $240,000 obligation is collateralized by a property worth only $192,000, resulting in a loan-to-value ratio of 125% and running counter to Farmland Partners' claim that these ratios would be "conservative."

79.     Despite Niebur defaulting on his previous obligation to the Company, the Individual Defendants carelessly proceeded to lend him even more money.  The Company disclosed this new loan (but not the identity of the borrower) on May 10, 2017, as Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017 (the "Q1 2017 Form 10-Q") with the SEC.  The Q1 2017 Form 10-Q disclosed that the previous $980,000 loan had been "renegotiated" into a new $2.194 million loan collateralized by two additional properties in Colorado.  In addition to concealing Niebur's identity, the Q1 2017 Form 10-Q also omitted the fact that the undisclosed borrower had defaulted on Farmland Partners' initial loan.

80.     Further, Farmland Partners' new $2.194 million loan to Niebur was, in realty, an acquisition of all three properties collateralizing Niebur's loans.  On the same day Farmland Partners acquired Andersons Farm for $801,800, the Company also acquired two additional properties from Niebur for $1.392 million.  The cumulative acquisition price of these three properties is $2.194 million, the same amount as Niebur's second loan.

#3370848v.1

81.     Niebur's bankruptcy records further support that in substance this loan was actually an acquisition. Niebur lists Farmland Partners as a creditor with respect to the $240,000 obligation, yet the $2.194 million loan is entirely omitted.  As further indicated by the bankruptcy records, Niebur and Farmland Partners shared an understanding that Niebur would never pay back the principal, let alone any interest.

82.     The Individual Defendants also lent, but did not disclose, an additional $68,000 to Niebur as a Company tenant.  Farmland Partners issued this loan to Niebur so that he could fulfill his rent obligation on a new lease with the Company.  According to Niebur's bankruptcy records, he signed a new lease agreement with Farmland Partners on March 15, 2017, which required his first annual rental payment of $61,750 by March 16, 2017.

**The Company Issues Undisclosed Loans to Hough**

83.     Farmland Partners' dubious related-party lending continued with Hough.  In a complicated series of transactions, the Company made at least three loans worth approximately $6 million to Hough or entities affiliated with Hough.

84.     First, on July 25, 2017, Farmland Partners loaned $100,000 to Hough through PHS Holdings LLC ("PHS Holdings"), an entity designated as a related party in the Company's IPO Prospectus.  The loan was secured by a property in Nebraska, with the deed of trust naming PHS Holdings as the trustor and with Hough signing as the entity's manager.

85.     Then, just one month later, on August 25, 2017, the Company loaned Hough an additional $669,000 through Hough Farms.  Hough signed the deed of trust as Hough Farm's general partner.

86.     The $100,000 loan made on July 25, 2017, follows a trajectory similar to Niebur's loans.  Hough defaulted on the loan; Farmland Partners acquired the property securing the loan; and then the Company lent Hough even more money despite his default.  The deed from the

#3370848v.1

Nebraska property shows that Hough (via PHS Holdings) conveyed the property to Farmland Partners on January 12, 2018. As was the case when Niebur defaulted, Farmland Partners simply acquired the property collateralizing the loan and considered the matter settled. The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2018 (the "Q1 2018 Form 10-Q") filed with the SEC on May 10, 2018, provides that the loan "was fully settled ... on the maturity date of January 1, 2018." However, the Q1 2018 Form 10-Q also lists January 31, 2018, as the maturity date.

87.     Then, on January 18, 2018, just six days after Farmland Partners acquired the Nebraska property, the Individual Defendants loaned Hough an additional $5.25 million via Siffring Farms, more than doubling the money under the FPI Loan Program from $4 million to $9.25 million. Hough signed the deed of trust for the loan as Siffring Farms' president, even though Siffring Farms is an inactive limited liability company whose president is supposedly Duane Siffring.

88.     It appears Hough used the $5.25 million loan to pay off his outstanding $669,000 obligation to Farmland Partners. According to the Q1 2018 Form 10-Q, Hough's $669,000 loan was settled on February 2, 2018, less than one month after Farmland Partners loaned him the additional $5.25 million.

89.     Although the defendants' loans to Niebur and Hough may have allowed a façade of growth of the FPI Loan Program, they produced no real benefit and ultimately were detrimental to the Company. Through these loans, defendants were able to record notes receivable and provide a false impression of a working loan program. In reality however, these loans were risky and added no value to Farmland Partners. They were also detrimental to the Company. First, these related-party loans represent a significant lost opportunity cost. Had defendants invested Farmland

Partners' money elsewhere—even in treasury bonds—they would have generated greater returns for the Company and its stockholders. In addition, Farmland Partners may never receive repayment from Niebur in light of his bankruptcy. Further, the Company's reputation was severely damaged when defendants' related-party loan scheme was revealed to the public.

## IMPROPER STATEMENTS

90. Between November 12, 2015 and July 10, 2018, the Individual Defendants made or caused Farmland Partners to disseminate a series of false and misleading statements concerning the FPI Loan Program in public filings with the SEC. Specifically, the Individual Defendants repeatedly claimed Farmland Partners granted loans to "third-party farmers" while issuing undisclosed loans to at least two related parties. The Individual Defendants also repeatedly emphasized the due diligence conducted in connection with issuing loans despite knowledge of their failure to properly vet related-party borrowers. In addition, defendants caused or allowed the Company to misrepresent its compliance with GAAP and the effectiveness of its internal controls.

91. On November 12, 2015, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended September 30, 2015 (the "Q3 2015 Form 10-Q") with the SEC. Although the FPI Loan Program was designed to lend money to related parties, the Q3 2015 Form 10-Q falsely claimed it was meant for "third-party farmers." Further, though these related-party loans created an unnecessary risk for Farmland Partners, the Q3 2015 Form 10-Q mischaracterized the FPI Loan Program as a "complement" to the Company's core business of leasing farmland. In particular, the Company stated:

*FPI Loan Program*

In August 2015, the Company announced the launch of the FPI Loan Program, an agricultural lending product aimed at farmers, as a complement to the Company's current business of acquiring and owning farmland and leasing it to farmers. ***Under the FPI Loan Program, we intend to make loans to third-party farmers*** (both tenant and nontenant) to provide partial financing for working capital requirements

and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

92.     Although the Q3 2015 Form 10-Q disclosed related-party transactions, which included those of Hough and defendant Pittman, the Individual Defendants concealed the October 2015 loan to Niebur, a related party.  In particular, the Q3 2015 Form 10-Q stated the following about related-party transactions:

**Note 4—Related Party Transactions**

\*     \*     \*

As of September 30, 2015, 11% of the acres in the Company's farm portfolio was rented to and operated by Astoria Farms or Hough Farms, both of which are related parties. Astoria Farms is a partnership in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which is 75% owned by Mr. Pittman, has a 33.34% interest. The balance of Astoria Farms is held by limited partnerships in which Mr. Pittman is the general partner. Hough Farms is a partnership in which Pittman Hough Farms has a 25% interest. The aggregate rent recognized by the Company for these entities for the three and nine months ended September 30, 2015 was $685,005 and $2,035,752, respectively, and was $618,710 and $1,856,129 for the three and nine months ended September 30, 2014, respectively. As of September 30, 2015 and December 31, 2014, the Company had accounts receivable from these entities of $380,122 and $182,763, respectively.

For the three and nine months ended September 30, 2014, Pittman Hough Farms incurred $0 and $219,597, respectively, in professional fees on behalf of the Company. No such amounts were incurred for the three and nine months ended September 30, 2015.

American Agriculture Corporation ("American Agriculture") is a Colorado corporation that is 75% owned by Mr. Pittman and 25% owned by Jesse J. Hough, who provides consulting services to the Company.  On April 16, 2014, the Company entered into a shared services agreement with American Agriculture pursuant to which the Company paid American Agriculture an annual fee of $175,000 in equal quarterly installments in exchange for management and accounting services. The agreement was terminated effective as of December 31, 2014, by mutual agreement of both parties.

93.     Though the Company failed to disclose the October 2015 loan to Niebur as a related-party transaction in accordance with ASC 850-10-50, the Individual Defendants falsely

represented the Q3 2015 Form 10-Q's compliance with GAAP. In particular, the Q3 2015 Form 10-Q stated:

> The accompanying combined consolidated financial statements are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

94.    Further, the Q3 2015 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q3 2015 Form 10-Q contained the signed certifications of defendants Pittman and Fabbri pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

95.    On March 15, 2016, Farmland Partners filed its Annual Report on Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K") with the SEC, which was signed by defendants Pittman, Fabbri, Downey, Bartels, Glauber, and Sarff. The 2015 Form 10-K again falsely represented the FPI Loan Program as being designed for third-party farmers. Specifically, the 2015 Form 10-K stated:

> **_Under the FPI Loan Program, we intend to make loans to third-party farmers_** (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

96.    In addition, the 2015 Form 10-K emphasized the synergies provided by the FPI Loan Program while highlighting the due diligence that Farmland Partners conducted as a predicate to issuing loans. Specifically, the 2015 Form 10-K conveyed that Farmland Partners' potential debtors would be screened as rigorously as the Company's potential tenants, meaning that loans would be granted based on "[the borrower's] willingness and ability to pay competitive

#3370848v.1

… rates." In reality however, the Individual Defendants failed to properly vet certain borrowers, as indicated by several loans being renegotiated, defaulted, wrapped into new loans, or threatened by the borrower's eventual bankruptcy. Rather, the main standard by which loans were granted was whether the recipient was a related party. As a result of these lenient underwriting standards, the FPI Loan Program was not "highly complementary to and synergistic with [Farmland Partners'] core business of investing in farmland" as the 2015 Form 10-K claimed. Instead, the FPI Loan Program was a detriment to the Company. In particular, the 2015 Form 10-K stated:

> In general, the tenant selection process focuses primarily on candidates' experience and reputation *based upon background and reference checks* of potential tenants, *as well as their willingness and ability to pay* competitive rental rates.

*   *   *

> *FPI Loan Program*
>
> We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. *We believe that the business of making loans secured by mortgages on farmland is highly complementary to, and synergistic with, our core business of investing in farmland.* We generally find potential borrowers during the process of sourcing farm acquisitions. *We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants.* The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

97.     Further, the 2015 Form 10-K downplayed the nature of the risks associated with the FPI Loan Program, mischaracterizing those risks as merely the fundamental ones "associated with being a lender." However, the FPI Loan Program exposed the Company to risks beyond those traditionally associated with lending because it was used to grant undisclosed loans to related parties. Unlike transactions with third parties, these related-party loans were not negotiated at arm's-length, were issued with more lenient underwriting standards, and presented an increased risk that the borrowers' indebtedness would be forgiven on the basis of their personal relationship.

#3370848v.1

Further, the FBI Loan Program presented a risk of reputational harm in the event the related-party

loans were revealed.  Specifically, the 2015 Form 10-K stated:

> **Under the FPI Loan Program, we provide loans to third-party farmers, which**
> **exposes us to risks associated with being a lender, including the risk that**
> **borrowers default on their obligations to us, which could adversely affect our**
> **results of operations and financial condition.**

98.     Although the 2015 Form 10-K disclosed the $980,000 loan issued by the Company

to Niebur, the Individual Defendants concealed Niebur's identity and status as a related-party

borrower, giving investors the false impression that the loan was a third-party transaction.   In

particular, the 2015 Form 10-K stated:

> On November 16, 2015, the Company entered into a promissory note agreement
> with a tenant farmer to provide $980,000 in the form of a mortgage note. The note
> has a fixed annual interest rate with principal and all accrued interest due at maturity
> on October 30, 2017. The note is collateralized by a first mortgage on farm real
> estate.

99.     Although the 2015 Form 10-K disclosed related-party transactions, those

disclosures omitted the October 2015 loan to Niebur, a related party.

100.    The 2015 Form 10-K affirmed that the Company's internal control over financial

reporting was effective and that there were no changes in the Company's internal control that

materially affected, or were reasonably likely to materially effect, the Company's internal control

over financial reporting.  The 2015 Form 10-K contained the signed certifications of defendants

Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information,

the disclosure of any material changes to the Company's internal control over financial reporting,

and the disclosure of all fraud.

101.    On May 10, 2016, Farmland Partners filed its Quarterly Report on Form 10-Q for

the period ended March 31, 2016 (the "Q1 2016 Form 10-Q") with the SEC.  The Q1 2016 Form

10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and

complementary to the Company's core business. In particular, the Q1 2016 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a *complement* to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). ***Under the FPI Loan Program, the Company makes loans to third-party farmers*** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

102.    The Q1 2016 Form 10-Q again emphasized the synergies provided by the FPI Loan

Program while highlighting the due diligence that Farmland Partners conducted as a predicate to

issuing loans. In particular, the Q1 2016 Form 10-Q stated:

*FPI Loan Program*

> We believe that our existing systems and personnel are well suited to source, perform due diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. ***We believe that the business of making loans secured by mortgages on farmland is highly complementary to, and synergistic with, our core business of investing in farmland***. We generally find potential borrowers during the process of sourcing farm acquisitions. ***We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants***. The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

103.    The Q1 2016 Form 10-Q again disclosed the $980,000 loan, but again concealed

Niebur's identity and status as a related-party borrower.

104.    The Q1 2016 Form 10-Q also provided a similar explanation of the Company's

related-party transactions contained in the 2015 Form 10-K.

105.    Though the Company failed to disclose the October 2015 loan to Niebur as a

related-party transaction in accordance with ASC 850-10-50, the Individual Defendants falsely

represented the Q1 2016 Form 10-Q's compliance with GAAP. In particular, the Q1 2016 Form

10-Q stated:

The accompanying combined consolidated financial statements for the periods ended March 31, 2016 and 2015 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

106.     Further, the Q1 2016 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting.  The Q1 2016 Form 10-Q contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

107.     On May 10, 2016, the Company held an earnings call with analysts and investors, during which defendant Pittman represented that all of the Company's acquisitions were arm's-length transactions.  Specifically, defendant Pittman stated: "Given that everything we [acquired] has been an arm's length market transaction of some sort in the last two years, we think acquisition cost is probably the safest judgment of value."

108.     On August 9, 2016, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended June 30, 2016 (the "Q2 2016 Form 10-Q") with the SEC.  The Q2 2016 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business.  In particular, the Q2 2016 Form 10-Q stated:

In August 2015, the Company introduced an agricultural lending product aimed at farmers as a ***complement*** to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program").  ***Under the FPI Loan Program, the Company makes loans to third-party farmers*** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

- 41 -

109.   The Q2 2016 Form 10-Q again disclosed the $980,000 loan while concealing Niebur's identity and status as a related-party borrower.

110.   The Q2 2016 Form 10-Q also provided a similar explanation of the Company's related-party transactions contained in the 2015 Form 10-K.

111.   Though the Company failed to disclose the October 2015 loan to Niebur as a related-party transaction in accordance with ASC 850-10-50, the Individual Defendants falsely represented the Q2 2016 Form 10-Q's compliance with GAAP.  In particular, the Q2 2016 Form 10-Q stated:

> The accompanying combined consolidated financial statements for the periods ended June 30, 2016 and 2015 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

112.   Further, the Q2 2016 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting.  The Q2 2016 Form 10-Q contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

113.   On November 7, 2016, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended September 30, 2016 (the "Q3 2016 Form 10-Q") with the SEC.  The Q3 2016 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business.  In particular, the Q3 2016 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a ***complement*** to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). ***Under the FPI Loan***

- 42 -

***Program, the Company makes loans to third-party farmers*** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

114.    The Q3 2016 Form 10-Q again disclosed the $980,000 loan, but again concealed Niebur's identity and status as a related-party borrower.

115.    The Q3 2016 Form 10-Q also provided a similar explanation of the Company's related-party transactions contained in the 2015 Form 10-K.

116.    Though the Company failed to disclose the October 2015 loan to Niebur as a related-party transaction in accordance with ASC 850-10-50, the Individual Defendants falsely represented the Q3 2016 Form 10-Q's compliance with GAAP.  In particular, the Q3 2016 Form 10-Q stated:

> The accompanying combined consolidated financial statements for the periods ended September 30, 2016 and 2015 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

117.    Further, the Q3 2016 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting.  The Q3 2016 Form 10-Q contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

118.    On February 23, 2017, Farmland Partners filed its Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K") with the SEC, which was signed by defendants Pittman, Fabbri, Downey, Bartels, Boardman, Conrad, Gimbel, Glauber, and Sarff.

- 43 -

The 2016 Form 10-K again falsely represented the FPI Loan Program as being designed for "third-party farmers." Specifically, the 2016 Form 10-K stated:

> **Under the FPI Loan Program, we make loans to third-party farmers** (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

119.    The 2016 Form 10-K again emphasized the synergies provided by the FPI Loan Program while highlighting the due diligence that Farmland Partners conducted as a predicate to issuing loans. Specifically, the 2016 Form 10-K stated:

> *FPI Loan Program*
>
> We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. *We believe that the business of making loans secured by mortgages on farmland is highly complementary to, and synergistic with, our core business of investing in farmland*. We generally find potential borrowers during the process of sourcing farm acquisitions. *We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants*. The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

120.    The 2016 Form 10-K continued to downplay the nature of the risks associated with the FPI Loan Program, mischaracterizing those risks as merely the fundamental ones "associated with being a lender." Specifically, the 2016 Form 10-K stated:

> **Under the FPI Loan Program, we provide loans to third-party farmers, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.**

121.    The 2016 Form 10-K again disclosed the $980,000 loan, but again concealed Niebur's identity and status as a related-party borrower.

122.    The 2016 Form 10-K also provided a similar explanation of the Company's related-party transactions contained in the 2015 Form 10-K.

- 44 -

123.    Though the Company failed to disclose the October 2015 loan to Niebur as a related-party transaction in accordance with ASC 850-10-50, the Individual Defendants falsely represented the 2016 Form 10-K's compliance with GAAP.  In particular, the 2016 Form 10-K stated:

> The accompanying consolidated financial statements are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

124.    Further, the 2016 Form 10-K affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting.  The 2016 Form 10-K contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

125.    On May 10, 2017, Farmland Partners filed its Q1 2017 Form 10-Q with the SEC.  The Q1 2017 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business.  In particular, the Q1 2017 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a *complement* to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program").  *Under the FPI Loan Program, the Company makes loans to third-party farmers* (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

126.    The status of Niebur's $980,000 loan remained unchanged until the Q1 2017 Form 10-Q, which reported that the loan had been "renegotiated."  Moreover, the Company disclosed

that it had simultaneously issued a second loan for a far more substantial amount of $2.194 million.

Niebur continued to pass off as an unrelated borrower, as the Q1 2017 Form 10-Q again failed to

disclose his identity and related-party designation.  In particular, the Q1 2017 Form 10-Q stated:

> The original note was renegotiated and a second note was entered into
> simultaneously, with the borrower during the quarter. The notes include mortgages
> on two additional properties in Colorado that include repurchase options for the
> properties at a fixed price that are exercisable between the second and fifth
> anniversary of the notes by the borrower.

127.   The Q1 2017 Form 10-Q's related-party disclosures continued to omit the

Company's October 2015 and March 2017 loans to Niebur.

128.   Though the Company failed to disclose its loans to Niebur as related-party

transactions in accordance with ASC 850-10-50, the Individual Defendants falsely represented the

Q1 2017 Form 10-Q's compliance with GAAP.  In particular, the Q1 2017 Form 10-Q stated:

> The accompanying consolidated financial statements for the periods ended March
> 31, 2017 and 2016 are presented on the accrual basis of accounting in accordance
> with accounting principles generally accepted in the United States of America
> ("GAAP") and include the accounts of the Company and the Operating Partnership.

129.   Further, the Q1 2017 Form 10-Q affirmed that the Company's internal control over

financial reporting was effective and that there were no changes in the Company's internal control

that materially affected, or were reasonably likely to materially effect, the Company's internal

control over financial reporting.  The Q1 2017 Form 10-Q contained the signed certifications of

defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial

information, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of all fraud.

130.   On July 21, 2017, Farmland Partners filed its Quarterly Report on Form 10-Q for

the period ended June 30, 2017 (the "Q2 2017 Form 10-Q") with the SEC.  The Q2 2017 Form 10-

Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and

complementary to the Company's core business. In particular, the Q2 2017 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at
> farmers as a *complement* to the Company's business of acquiring and owning
> farmland and leasing it to farmers (the "FPI Loan Program"). ***Under the FPI Loan***
> ***Program, the Company makes loans to third-party farmers*** (both tenant and non-
> tenant) to provide financing for working capital requirements and operational
> farming activities, farming infrastructure projects, and for other farming and
> agricultural real estate related projects.

131.   The Q2 2017 Form 10-Q again disclosed the $980,000 loan, but again concealed

Niebur's identity and status as a related-party borrower.  The Q2 2017 Form 10-Q also disclosed

the second $2.194 million loan and similarly concealed Niebur's identity and status as a related-

party borrower.

132.   Although the 2Q 2017 Form 10-Q disclosed related-party transactions, the

Individual Defendants concealed the October 2015 and March 2017 loans to Niebur, in those

disclosures.

133.   Though the Company failed to disclose its loans to Niebur as related-party

transactions in accordance with ASC 850-10-50, the Individual Defendants falsely represented the

Q2 2017 Form 10-Q's compliance with GAAP.  In particular, the Q2 2017 Form 10-Q stated:

> The accompanying consolidated financial statements for the periods ended June 30,
> 2017 and 2016 are presented on the accrual basis of accounting in accordance with
> accounting principles generally accepted in the United States of America
> ("GAAP") and include the accounts of the Company and the Operating Partnership.

134.   Further, the Q2 2017 Form 10-Q affirmed that the Company's internal control over

financial reporting was effective and that there were no changes in the Company's internal control

that materially affected, or were reasonably likely to materially effect, the Company's internal

control over financial reporting.  The Q2 2017 Form 10-Q contained the signed certifications of

defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial

information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

135.    On November 9, 2017, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended September 30, 2017 (the "Q3 2017 Form 10-Q") with the SEC.  The Q3 2017 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business.  In particular, the Q3 2017 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a ***complement*** to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program").  ***Under the FPI Loan Program, the Company makes loans to third-party farmers*** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

136.    The Q3 2017 Form 10-Q again disclosed the $2.194 million loan while concealing Niebur's identity and status as a related-party borrower.  The Q3 2017 Form 10-Q also disclosed new loans for $100,000 and $669,000 while similarly concealing Hough's identity and status as a related-party borrower.

137.    Although the 3Q 2017 Form 10-Q disclosed related-party transactions, the Individual Defendants concealed the October 2015 and March 2017 loans to Niebur, and also omitted the July and August 2017 loans to Hough in those disclosures.

138.    Though the Company failed to disclose its loans to Niebur and Hough as related-party transactions in accordance with ASC 850-10-50, the Individual Defendants falsely represented the Q3 2017 Form 10-Q's compliance with GAAP.  In particular, the Q3 2017 Form 10-Q stated:

> The accompanying consolidated financial statements for the periods ended September 30, 2017 and 2016 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

- 48 -

139.    Further, the Q3 2017 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q3 2017 Form 10-Q contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

140.    On March 5, 2018, Farmland Partners filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC, which was signed by defendants Pittman, Fabbri, Downey, Bartels, Glauber, Good, and Gimbel. The 2017 Form 10-K again falsely represented the FPI Loan Program as being designed for "third-party farmers." Specifically, the 2017 Form 10-K stated:

> **Under the FPI Loan Program, we make loans to third-party farmers** (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

141.    The 2017 Form 10-K again emphasized the synergies provided by the FPI Loan Program while highlighting the due diligence that Farmland Partners conducted as a predicate to issuing loans. Specifically, the 2017 Form 10-K stated:

> *FPI Loan Program*
>
> We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. *We believe that the business of making loans secured by mortgages on farmland is highly complementary to, and synergistic with, our core business of investing in farmland*. We generally find potential borrowers during the process of sourcing farm acquisitions. *We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants*. The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

142.     The 2017 Form 10-K continued to downplay the nature of the risks associated with the FPI Loan Program, mischaracterizing those risks as merely the fundamental ones "associated with being a lender." Specifically, the 2017 Form 10-K stated:

> **Under the FPI Loan Program, we provide loans to third-party farmers, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.**

143.     The 2017 Form 10-K again disclosed the $2.194 million loan, the $100,000 loan, and the $669,000 loan while concealing the identities of Niebur and Hough and their statuses as related-party borrowers.

144.     Although the 2017 Form 10-K disclosed related-party transactions, the Individual Defendants concealed the October 2015 and March 2017 loans to Niebur, and also omitted the July and August 2017 loans to Hough in those disclosures.

145.     Though the Company failed to disclose its loans to Niebur and Hough as related-party transactions in accordance with ASC 850-10-50, the Individual Defendants falsely represented the 2017 Form 10-K's compliance with GAAP. In particular, the 2017 Form 10-K stated:

> The accompanying consolidated financial statements are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

146.     Further, the 2017 Form 10-K affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The 2017 Form 10-K contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial

#3370848v.1

information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

147. On May 10, 2018, Farmland Partners filed its Q1 2018 Form 10-Q with the SEC. The Q1 2018 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business. In particular, the Q1 2018 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a ***complement*** to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). ***Under the FPI Loan Program, the Company makes loans to third-party farmers*** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

148. The Q1 2018 Form 10-Q again disclosed the $2.194 million loan, the $100,000 loan, and the $669,000 loan while concealing the identities of Niebur and Hough and their statuses as related-party borrowers. As to Hough's loans for $100,000 and $669,000, the Q1 2018 Form 10-Q stated they were "fully settled." The Q1 2018 Form 10-Q also disclosed a new loan for $5.25 million without disclosing Hough's identity and status as a related-party borrower.

149. Although the Q1 2018 Form 10-Q disclosed related-party transactions, the Individual Defendants concealed the October 2015 and March 2017 loans to Niebur, and also omitted the July 2017, August 2017, and January 2018 loans to Hough in those disclosures.

150. Though the Company failed to disclose its loans to Niebur and Hough as related-party transactions in accordance with ASC 850-10-50, the Individual Defendants falsely represented the Q1 2018 Form 10-Q's compliance with GAAP. In particular, the Q1 2018 Form 10-Q stated:

> The accompanying consolidated financial statements for the periods ended March 31, 2018 and 2017 are presented on the accrual basis of accounting in accordance

with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

151.    Further, the Q1 2018 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting.  The Q1 2018 Form 10-Q contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

## REASONS THE STATEMENTS WERE IMPROPER

152.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)    the Individual Defendants were using the FPI Loan Program to issue loans to related parties, not "third-party farmers";

(b)    these related-party loans were issued without properly vetting the borrower's ability to pay, were not negotiated at arm's-length, reflected more lenient underwriting standards than those with third parties, and presented increased risks beyond those traditionally associated with being a lender;

(c)    the Company failed to disclose the loans to Niebur and Hough as related-party transactions, as was required;

(d)    Farmland Partners was inflating its revenue and earnings by issuing these loans to related-party tenants who would then circle the money back to the Company in the form of rent payment; and

- 52 -

(e)     as a result of the foregoing, Farmland Partners' statements concerning the Company's financial results and future prospects, compliance with GAAP, and effectiveness of its internal controls were improper.

## SUSPICIOUS DEPARTURES PRIOR TO THE TRUTH'S REVELATION

153.    While making the dubious loans and improper statements detailed above, several defendants suspiciously resigned from their positions at Farmland Partners, including the former President, defendant Cowan, and four former directors, defendants Conrad, Boardman, Sarff, and Gimbel.  In the midst of these departures, the Company also inexplicably dismissed its public accounting firm.

154.    On August 28, 2017, defendant Conrad resigned from the Board, reducing the number of Farmland Partners' directors from eight to seven.  On September 1, 2017, the Company filed a Current Report on Form 8-K with the SEC announcing defendant Conrad's resignation that explains little about his departure other than it was "due to personal reasons and was not the result of any disagreements with the Company."

155.    On December 5, 2017, defendant Boardman resigned from the Board, further reducing the number of Farmland Partners' directors from seven to six.  On December 8, 2017, the Company filed a Current Report on Form 8-K with the SEC announcing defendant Boardman's resignation that similarly provides little explanation about his departure other than it was "due to his desire to devote more time to his other business interests and was not the result of any disagreements with the Company."

156.    Less than a month later, on January 18, 2018, defendant Sarff resigned from the Board.  On January 23, 2018, the Company filed a Current Report on Form 8-K with the SEC announcing defendant Sarff's resignation that provided an undetailed explanation for his departure, stating it "was due to his desire to devote more time to his other business interests and was not the

result of any disagreements with the Company." The Form 8-K concurrently announced defendant Good's appointment to the Board to fill defendant Sarff's vacancy.

157.    On March 13, 2018, the Company filed a Current Report on Form 8-K announcing that it had dismissed its public accounting firm, PricewaterhouseCoopers LLP ("PwC") on March 10, 2018. The Company gave no reason for its dismissal of PwC.

158.    A few days later, on March 20, 2018, the Company filed a Current Report on Form 8-K with the SEC announcing defendant Gimbel's decision not to stand for reelection to the Board upon his term's expiration at the Company's 2018 Annual Meeting of Stockholders. Farmland Partners again explained the resignation was "due to his desire to devote more time to his other business interests and [was] not the result of any disagreement with the Company."

159.    Less than a month later, on April 13, 2018, Farmland Partners filed a Current Report on Form 8-K with the SEC announcing the Company's entry into a separation agreement with defendant Cowan, explaining that he will "retire from his role as President of the Company effective May 31, 2018." The Form 8-K stated his "decision to retire ... [was] not the result of any disagreement with the Company."

160.    Although Farmland Partners maintains that they were not "the result of any disagreement with the Company," the resignations of defendants Conrad, Boardman, Sarff, Gimbel, and Cowan remain suspect given that they occurred on the cusp of the Company's January 2018 loan to Hough in the amount of $5.25 million, which more than doubled the money loaned under the FPI Loan Program from $4 million to $9.25 million.

## THE TRUTH EMERGES

161.    On July 11, 2018, the truth about the Company's related-party loans and questionable accounting maneuvers emerged, as Rota Fortunae published a well-documented and extensive report detailing the researcher's findings on Farmland Partners and the FPI Loan

- 54 -

Program.  The Rota Fortunae Report revealed for the first time that just two individuals, related-

parties Niebur and Hough, received over 70% of the total money issued through the FPI Loan

Program.  The Rota Fortunae Report further exposed that several of these loans had defaulted,

been renegotiated, wrapped into new loans, or were threatened by Niebur's bankruptcy.   In

particular, the Rota Fortunae Report provided:

> ***While FPI discloses its loans, it has neglected to disclose that over 70% of its
> loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI
> tenants and members of FPI's management team).*** Ryan Niebur is a now-
> bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed)
> was bailed out when FPI acquired his properties, falsely reported the purchase as a
> loan and then lent him an additional $61,800 the day after he signed a lease with
> FPI for $61,750.

> Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and
> an FPI consultant. In July 2017, FPI made a loan secured by one of Hough's
> properties, which FPI then acquired two weeks before the loan matured and leased
> back to him just days before FPI lent him another $5.25 Million, this time as the
> president of an inactive entity that corporate records show he has no affiliation with,
> and that is secured by land that deed records show he does not own.

> \*   \*   \*

> Niebur's [first] loan remained unchanged until the 1Q2017 10-Q (pg. 16) when FPI
> disclosed that it "renegotiated" the loan while simultaneously entering into a new
> $2.194 Million loan ... collateralized by two additional properties .... [A]nd in
> which the deed specifically states that Niebur was in default on the loan and
> obligated to pay a remaining balance....

162.    In questioning Farmland Partners' rationale for issuing loans to borrowers despite

their apparent inability to pay, the Rota Fortunae Report revealed the likelihood of the Company

playing "accounting games" to artificially inflate its revenue.  The report explained that Farmland

Partners accomplished the revenue inflation by making loans to Niebur and Hough, both of whom

were related-party tenants who circled the money back to the Company, which Farmland Partners

then reported as rent and interest revenue.  Specifically, the Rota Fortunae Report stated:

> When we started looking into FPI, we found it ***was playing classic accounting
> games*** like capitalizing part of the expense to lease CEO Paul Pittman's personal

#3370848v.1

jet and excluding farms from its same-property rent number. But it was not until we reviewed hundreds of deed records in dozens of counties across the country that we came to believe that FPI faces a significant risk of insolvency.

***Our research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who roundtrip the cash back to FPI as rent and interest revenue.*** We believe these loans lack economic substance because, whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price when the mortgage matures.

And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant. In total, we believe up to 6% of 2017 revenues and 310% of 2017 net income could be the result of transactions that are just moving money from one side of the desk to the other.

163.    The Rota Fortunae Report further speculated an imminent cut in Farmland Partners' dividend, stating, "[w]ith only $19 Million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency."

164.    Upon these revelations, the Company's common stock plunged $3.37 per share, or nearly 39%, to close at $5.28 per share on July 11, 2018, compared to the previous trading day's closing of $8.65 per share.  The Company's preferred stock also took a hit of $6.42 per share, or 26%, to close at $18.15 per share on July 11, 2018, compared to the previous day's closing of $24.57 per share.  In total, Farmland Partners' market capitalization of common and preferred stock plunged more than $110 million and $38 million, respectively, in a single day.

165.    On July 17, 2018, in an effort to control the damage resulting from the Rota Fortunae Report, Farmland Partners issued a press release purporting to refute the report's claims. In the press release, Farmland Partners asserted that both Niebur and Hough are not related parties because neither had any "decision-making authority." In particular, the press release stated:

#3370848v.1

*Neither Ryan Niebur nor Jesse Hough are "related parties" as defined by applicable rules of the SEC and the Financial Accounting Standards Board ('FASB') and were not 'related parties' at the time of any loan made to them.*

\* \* \*

Ryan Niebur was and is a tenant of the Company and he worked part-time for the Company as a farm manager from September 2015 to December 2017. *Ryan Niebur* was never a member of the Company's senior management team and never had corporate *decision-making authority*. He is not a "related party" under applicable SEC and FASB rules. We continue to believe the loans made to Ryan Niebur are good loans and will perform well for the Company.

Jesse Hough was not a "related party" under applicable SEC and FASB rules at the time loans were made. Mr. Hough is a tenant and a borrower of the Company. From April 16, 2014 through April 16, 2018, Mr. Hough was a consultant of the Company. He was a business partner of FPI's Chairman and CEO, Paul Pittman, prior to the Company's initial public offering and during the first couple of years subsequent to the initial public offering. During the period Mr. Hough and Mr. Pittman remained business partners, the Company appropriately disclosed Mr. Pittman's relationship with Mr. Hough under the related party transactions disclosures in the Company's public filings (see, for example, "Note 4–Related Party Transactions" on page F-17 of the Company's Annual Report on Form 10-K for the year ended December 31, 2015). Mr. *Hough never had decision-making authority* over any matters or transactions involving the Company.

166.    Under ASC 850, however, a related party is not defined as one with "decision-making authority," but rather one who "can significantly influence the management or operating policies." In the Securities Class Action, Judge Ebel noted and applied this appropriate standard in denying the defendants' motion to dismiss, finding that the plaintiffs sufficiently alleged "that Niebur and Hough were related parties during the relevant times."

167.    Also in the July 17, 2018 press release, the Individual Defendants declared their belief that "the loans made to Ryan Niebur are good loans and will perform well for the Company." The Individual Defendants knew this was not true, as revealed by Niebur's bankruptcy records. Specifically, on May 24, 2018, affiliates of Farmland Partners filed an objection to Niebur's proposed bankruptcy plan of reorganization, which sought to assign the Company's farmland leases to another entity controlled by Niebur. Farmland Partners objected to the assignment based

in part on the assertion that the debtors—Niebur, his wife, and Niebur's company—failed to demonstrate their ability to satisfy the payments under the proposed plan. The objection—filed less than two months prior to the press release on May 24, 2018—shows that the Individual Defendants knew Niebur's loans would not perform well for the Company.

168.    On July 18, 2018, *Seeking Alpha* published a report authored by "Beyond Saving" titled "Farmland Partners: The Smell Test." Beyond Saving argues that—regardless of whether Farmland Partners was obligated to disclose the related-party loans and regardless of the magnitude—the Company should have disclosed Niebur's bankruptcy, as most REITs do. In particular, Beyond Saving wrote:

> There are some issues that were not addressed by FPI, such as the Niebur bankruptcy. Niebur is a tenant and a borrower under the lending program, and FPI has counsel representing them in the bankruptcy. Even if the amounts at risk are minimal and the risk of either the leases or the loans being modified are slim, a bankruptcy is something that should be disclosed. Even if the tenant/borrower remains unnamed, I think shareholders should be informed. I do not make any claims as to whether or not FPI had a legal obligation to disclose it, but most REITs do disclose tenant bankruptcies even when they are not expected to impact rent. Hopefully, FPI will reconsider some of their disclosures and will seek to have better clarity moving forward.

169.    Shortly after the Rota Fortunae Report, on July 24, 2018, the Company further reacted by filing the Defamation Lawsuit against those involved with writing and distributing the report. The Defamation Lawsuit alleges the following claims: (i) defamation; (ii) disparagement; (iii) intentional interference with prospective business relations; (iv) unjust enrichment; (v) deceptive trade practices; and (vi) civil conspiracy.

170.    Less than one month after the Rota Fortunae Report, on August 8, 2018, Farmland Partners issued a press release announcing poor financial results for the second quarter ended June 30, 2018. The press release reported a net loss of $2.3 million compared to a net income of $0.8 million during the same period the previous year. Further, the press release disclosed a cut in the

Company's quarterly dividend, as the Rota Fortunae Report had predicted.  Specifically, Farmland Partners cut the dividend to $0.05 per share of common stock, representing a slash of more than 50%, compared to the Company's previous dividend of $0.1275 per share.  Moreover, Farmland Partners lowered its 2018 earnings guidance by $0.10 per share to range of $0.30-0.34 per share. Finally, the press release announced the Board had authorized an additional $30 million in repurchases of Farmland Partners' common stock or Series B Perpetual Preferred Stock, to be financed by asset sales and dividend cuts.

171.    The next day, on August 9, 2018, the Company held an earnings call with analysts and investors to discuss Farmland Partners' second quarter 2018 results.  Throughout the call, defendant Pittman blamed the Company's poor performance and dividend cuts on the Rota Fortunae Report.  In addition to the claimed "lost revenue for new business ventures," defendant Pittman also blamed the report for "additional costs and expenses, including litigation expenses." Thus, defendant Pittman failed to accept his responsibility for failing to disclose the Company's related-party transactions and, at the same time, informed stockholders that the Company would now bear the cost of litigating against Rota Fortunae.  In particular, defendant Pittman stated:

> I would now like to touch briefly on the misleading anonymously written Seeking Alpha report. We issued a detailed press release refuting the allegations, so I will not go through the Seeking Alpha report point by point. We have no intent on dwelling on this issue, we are instead focused on what it means for our shareholders and what we can do. ***We will pursue litigation and cooperate with law enforcement to see that justice is done and to attempt to recoup money for our shareholders.*** We are also instituting an employee retention plan for the nonexecutive members of our team. When your stock declines, like ours did, it creates many short-term issues, but it also creates significant opportunity.
>
> ***In the short term, we will face lost revenue for new business ventures, decreased growth in acquisitions and capital expenditures, and additional costs and expenses, including litigation expenses, all resulting from the misleading Seeking Alpha article.***
>
> With this short-term issue, we also find opportunities to benefit our shareholders by reinvesting in our company by buying back our shares. We intend to repurchase

discounted shares, which allows us to increase the ownership of our farms at deep discounts for the benefit of all shareholders.

172.     On August 13, 2018, *Seeking Alpha* published another report authored by "Beyond Saving" titled "Farmland Partners: Opacity." The report challenges defendant Pittman's accusation that the Rota Fortunae Report caused the Company's revenue guidance reduction and dividend cut. Beyond Saving opined that both were likely to occur regardless of the report given the Company's poor performance. Beyond Saving also doubted defendant Pittman's assertion that "lost revenue opportunities from planned joint ventures" contributed to the reduction in 2018's earning guidance, questioning the likelihood any potential deal both closing and generating revenue within the second and third quarters of 2018, a short period of time. In particular, Beyond Saving wrote:

> The big change is revenue, coming in $2 million lower than projected. In the conference call, Mr. Pittman suggested there was a JV deal that fell apart due to the article and ensuing price drop. It makes sense that such a thing could happen, especially if FPI was intending to contribute equity to the deal. What confuses me is how annual guidance could have been counting on such a deal for revenue when it can't be reasonably expected to close until late in Q3 or Q4.

173.     Primarily, Beyond Saving criticized Farmland Partners' consistent "opacity," noting that the Company "routinely has poor transparency on numbers that are important to investors." Beyond Saving points out that if the Individual Defendants had been transparent upfront, the Rota Fortuna Report's impact on the Company would have been far less dramatic. Specifically, Beyond Saving stated:

> If I have to summarize my criticisms of FPI in one word, it would be "opacity". As I discussed in previous articles, FPI routinely has poor transparency on numbers that are important to investors.
>
> Basic things like leasing spreads, acquisition cap rates, disposition cap rates and tenant defaults have inadequate disclosures. Rota Fortunae demonstrated how applying a story to small pieces of factual information can lead to a very negative result. If FPI had been more transparent up front, Rota's allegations likely would have had much less impact. The only thing the market hates more than bad news is the unknown.

#3370848v.1

FPI should take this opportunity to consider being more open with investors. Provide same-store numbers in a way that is clear. Provide information on leasing trends, which sections of the portfolio are strengthening, and which are weaker? When properties are acquired, what are the initial leases? How many tenants are defaulting? Investors shouldn't find out about defaults and bankruptcies from an anonymous contributor on Seeking Alpha.

Providing information in a clear and digestible manner will go a long way towards helping rebuild investor confidence in management.

174.    On November 6, 2018, the Company hosted an earnings call with analysts and investors to discuss Farmland Partners' third quarter 2018 results.   During his opening statement, defendant Pittman touted the Company's continued effort "to achieve justice and financial recovery for [its] shareholders for the damage caused by … [the] Rota Fortunae [Report]."   However, these efforts to rebut the Rota Fortunae Report remain unsuccessful.   Farmland Partners' common stock continues to dwell in the $6 range, not far from where it was after the report was published on July 11, 2018.

175.    The Individual Defendants' fruitless endeavor to rebut the Rota Fortunae Report have thus far only increased the costs and damages borne by the Company.   Farmland Partners' Annual Report on Form 10-K for the year ended December 31, 2018, filed with the SEC on March 15, 2019, discloses legal and accounting expenses of $2.33 million, representing over a 60% increase from the previous year.   Farmland Partners explained these increased expenses were "primarily attributable to increased costs related to litigation for the Rota Fortunae matter."

## THE INDIVIDUAL DEFENDANTS CAUSE FARMLAND PARTNERS TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

176.    In breach of their duties to Farmland Partners, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, defendants Pittman, Downey, Bartels, Glauber, Good, Sarff, Conrad, Gimbel, and Boardman caused or approved the Company's repurchase of 1.9 million shares of its stock at artificially inflated prices.   Despite knowingly or recklessly disregarding that

#3370848v.1

the Company's stock price was inflated due to the improper statements detailed herein, the Individual Defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases described below.

177.    The Company's 2017 Form 10-K explains that on March 15, 2017, the Board approved a program to repurchase up to $25 million in shares of Farmland Partners' common stock. The 2017 Form 10-K discloses that the Individual Defendants "expect to fund repurchases under the program using cash on [Farmland Partners'] balance sheet."

178.    Between August 2017 and March 2018, while concealing their risky related-party loans and general mismanagement, the Individual Defendants caused or allowed Farmland Partners to pay over $16.5 million to repurchase its stock for an average price of $8.69 per share. In particular, Farmland Partners made the following repurchases:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| Aug-17 | 274,000 | $8.54 | $2,339,960 |
| Sep-17 | 567,000 | $9.00 | $5,103,000 |
| Oct-17 | 279,000 | $9.15 | $2,552,850 |
| Mar-18 | 780,029 | $8.36 | $6,521,042 |
| | 1,900,029 | | $16,516,852 |

179.    Through these repurchases, the Director Defendants falsely signaled to the market that they believed Farmland Partners' shares were undervalued and that the repurchases were the best use of the Company's cash.  Because share repurchases lower the number of outstanding shares, the repurchases also increased the Company's earnings per share, return on equity, return on assets, and other metrics.  Collectively, these actions artificially inflated Farmland Partners' share price with each repurchase, and increased the price for each subsequent repurchase.

180.    As of December 31, 2018, Farmland Partners had $16.9 million of cash and cash equivalents compared to $53.5 million at December 31, 2017, and $47.2 million at December 31,

#3370848v.1

2016. The above repurchases of over $16.5 million worth of Farmland Partners' stock thus substantially reduced the Company's cash on hand.

181. When the truth about the Individual Defendants' risky related-party loan scheme and general mismanagement emerged, Farmland Partners' common stock plummeted to $5.28 per share. The Company's common stock has failed to recover from the Rota Fortunae Report's corrective disclosures and continues to languish in the $6 range. As a result, the 1.9 million shares the Company repurchased between August 2017 and March 2018 for $16.5 million were only worth approximately $10.45 million, or 63%, of what Farmland Partners paid for them.

## DAMAGES TO FARMLAND PARTNERS

182. As a result of the Individual Defendants' improprieties, Farmland Partners disseminated improper, public statements concerning the FPI Loan Program, related-party transactions, and future financial prospects. These improper statements have devastated Farmland Partners' credibility, as reflected by the Company's common stock plummeting by nearly 39% upon the Rota Fortunae Report's publication, erasing more than $110 million in market capitalization in a single day. Even over a year later, the Company's common stock continues to languish in the $6 range, close to where it was on July 11, 2018.

183. Farmland Partners' performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Farmland Partners' current and potential investors and customers (i.e., tenants) consider a company's trustworthiness, stability, and ability to evaluate known risks. Investors are less likely to invest in companies that use corporate assets to secretly enter into risky transactions that favor related parties. Investors are also less likely invest in companies that disseminate improper statements and fail to comply with their own internal protocols and external regulations. Farmland Partners' ability to raise equity

capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

184.    Further, as a direct and proximate result of the Individual Defendants' actions, Farmland Partners has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from the Company's issuance of related-party loans;

(b)    costs incurred from defending and paying any settlement in the Securities Class Action;

(c)    costs incurred from initiating and pursuing litigation against those involved with the Rota Fortunae Report;

(d)    excessive sums paid to repurchase Company stock; and

(e)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Farmland Partners.

## **DERIVATIVE AND DEMAND REFUSED ALLEGATIONS**

185.    Plaintiff brings this action derivatively in the right and for the benefit of Farmland Partners to redress injuries suffered, and to be suffered, by the Company as a direct result of violations of securities law, breach of duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Farmland Partners is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

- 64 -

186.    Plaintiff will adequately and fairly represent the interests of Farmland Partners in enforcing and prosecuting its rights.

187.    Plaintiff has continuously been a Farmland Partners stockholder since November 2016.

188.    The current Board of Farmland Partners consists of the following five individuals: defendants Pittman, Downey, Bartels, Glauber, and Good.

189.    Boards of directors have an affirmative duty to conduct a reasonable, objective, and good faith investigation into the allegations in a stockholder litigation demand, and to determine on the basis of that investigation whether the demand's factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the company's best interests. Boards that fulfill their duty to investigate a stockholder's litigation demand reasonably, objectively, and in good faith, and to act reasonably on the basis of the investigation, retain the protections of the business judgment rule's presumption that they acted independently, on a reasonably informed basis, and in good faith. Boards that fail to do so may not avail themselves of this presumption, and the stockholder's litigation demand will be deemed to have been wrongfully refused.

190.    On April 25, 2019, Plaintiff's counsel sent Plaintiff's Demand to the Board pursuant to Maryland law, demanding the Board to investigate the foregoing facts and claims, and to address, remedy, and commence proceedings against the corporate fiduciaries responsible for damaging Farmland Partners.[3]  In particular, the Demand explained that Plaintiff was concerned

---

[3] A true and correct copy of the Demand is attached hereto as Exhibit A.

with the damages caused by the Company's dubious related-party loans and the improper statements detailed herein.

191.    Plaintiff demanded that independent and disinterested directors, with the assistance of independent outside counsel, undertake an investigation of the wrongdoing detailed in the Demand. The Demand specified the investigation should be sufficient to determine five matters: (i) which current or former Company employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's improper disclosures; (ii) which current or former Company employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's failure to comply with applicable laws; (iii) which current or former Company employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the oversight of the foregoing; (iv) the extent to which the current or former Company employees, officers, directors, and/or agents benefited as a result of the breaches of duties owed to the Company and its stockholders; and (v) the extent to which Farmland Partners was damaged by the foregoing.

192.    On May 23, 2019, James J. Beha II ("Beha") of the law firm Morrison & Foerster LLP sent a letter responding to the Demand.[4]  Importantly, Beha is also representing Farmland Partners and defendants Pittman and Fabbri in the Securities Class Action. In his letter, Beha asked for "evidence of [Plaintiff's] continuous stock ownership of FPI stock from May 9, 2017, through the present," claiming that "the Board needs to confirm [Plaintiff's] status as a shareholder

---

[4] A true and correct copy of the May 23, 2019 letter is attached hereto as Exhibit B.

#3370848v.1

for the relevant time period before assessing the appropriate steps, if any, to take in response to the Demand."

193.    Beha's letter demonstrates that he and the Board had already prejudged the Demand and were only concerned with the potential liability the Board and management faced, not with investigating the Demand's underlying facts. Although Maryland law requires demands to provide the stockholder's name, it does not require proof of the stockholder's continuous stock ownership. As such, Beha's request that Plaintiff establish standing to bring a derivative suit (i.e., showing continuous stock ownership) in order to pursue a litigation demand is without legal basis. Beha's baseless request demonstrates that he and the Board were preoccupied with potential liability and Plaintiff's derivative standing rather than their obligations under Maryland law to conduct a reasonable, objective, and good faith investigation into the Demand.

194.    Nevertheless, on May 29, 2019, Plaintiff's counsel promptly responded to Beha by sending a letter furnishing the requested proof of Plaintiff's continuous stock ownership.[5] The letter noted that while Plaintiff's counsel disagreed such proof was required, it was nonetheless being provided to avoid needless dispute and delay.

195.    Having received no reply from Beha or the Board despite sending them the requested proof, on July 10, 2019, Plaintiff's counsel sent a letter to Beha seeking an update.[6] The letter asked what steps, if any, the Board had taken in response to the Demand. Specifically, Plaintiff's counsel requested information concerning the following: "(a) whether the Board has initiated an investigation; (b) whether the Board formed a special committee to consider the

---

[5] A true and correct copy of the May 29, 2019 letter is attached hereto as Exhibit C.

[6] A true and correct copy of the July 10, 2019 letter is attached hereto as Exhibit D.

#3370848v.1

Demand; (c) whether the Board (or any committee of the Board tasked with investigating the Demand) has retained independent counsel; and (d) any other steps the Board has taken in response to the Demand." Plaintiff's counsel also detailed additional facts supporting Plaintiff's concerns that the officers and directors of Farmland Partners breached their fiduciary duties. In particular, Plaintiff's letter explained that on June 18, 2019, Judge Ebel denied the Securities Class Action defendants' motion to dismiss. The letter explained that, in doing do, Judge Ebel found that the investors adequately alleged—under the heightened pleading standards of the PSLRA—that the defendants made materially false and misleading statements and omissions concerning related-party loans and due diligence for the FBI Loan Program. Plaintiff pointed out that the denial leaves Farmland Partners exposed to liability for the wrongdoing of its fiduciaries and further bolsters the allegations detailed in the Demand.

196.    On August 1, 2019 (just over three months after the Demand was issued), Beha wrote a letter to Plaintiff's counsel informing Plaintiff that the Board had rejected the Demand (the "Rejection Letter").[7]  The Rejection Letter evidences an utter lack of good faith and a complete failure to conduct an investigation into the Demand's allegations, let alone any reasonable investigation. Even if the required reasonable investigation had been undertaken (which it had not and almost certainly could not have been in a mere three months), the Rejection Letter shows the Board lacked independence in deciding to reject Plaintiff's Demand insofar as it was tainted by Beha and made without isolating conflicted members of the Board.

197.    First, the Rejection Letter begins with a premature evaluation that the Demand's allegations "appear[] to be based entirely on allegations from a July 11, 2018 article [the Rota

---

[7] A true and correct copy of the Rejection Letter is attached hereto as Exhibit E.

Fortunae Report]." This is not so. Although the Demand discusses the Rota Fortuna Report and the allegations overlap in part, several of the Demand's allegations are entirely unique. In particular, the Demand detailed potentially improper statements in the Company's 2015 and 2017 Proxy Statements. The Demand also contains unique allegations related to the Company's statements concerning: (i) its compliance with GAAP; (ii) the effectiveness of its internal controls; and (iii) its certifications pursuant to SOX. The foregoing allegations—which were based on a thorough investigation conducted by Plaintiff's counsel that went beyond the Rota Fortunae Report and included scouring through public records and the Company's SEC filings—were neither mentioned in the Rota Fortunae Report nor considered by the Board. The Board did not consider these allegations in rejecting Plaintiff's Demand and therefore failed in its duty to investigate the Demand's allegations.

198.    The Rejection Letter openly acknowledges the Board's failure to investigate the Demand's allegations, stating that because the Board has already investigated the Rota Fortuna Report and the Securities Class Action and "concluded that the allegations are without merit.... [T]he Demand provided no basis to re-consider its previous conclusion." However, even if the Board had concluded these allegations were without merit, there was no basis for the Board to conclude that *the Demand's* allegations "are without merit," especially given that the Rota Fortunae Report and Securities Class Action did not address several points raised in the Demand.

199.    Even if the Demand lacked unique allegations such that merit of the Rota Fortunae Report could likewise determine the merit of the Demand, the Rejection Letter demonstrates a complete lack of due care and good faith in the Board's purported investigation into the Rota Fortunae Report. The Rejection Letter provides that "details" concerning the Board's conclusion that the Rota Fortunae Report's allegations are without merit can be found in the Company's press

releases "issued on July 11 and 17, 2018." These press releases were issued either on the same day as or only six days after the Rota Fortunae Report, hardly enough time to conduct a reasonable investigation into the report and barely enough time to craft a well-constructed denial. These press releases make no mention of any investigation whatsoever because the Board never truly conducted one. Instead, the Board defends that Farmland Partners was a victim of a "short-and-distort" scheme, a point which the Rejection Letter reiterates. However, even if Farmland Partners was the victim of a short-and-distort attack, that does not mean there was no wrongdoing. The Board's determination that Farmland Partners was the victim of a short-and-distort attack in just six days, without any investigation whatsoever into potential breaches of fiduciary duty or wrongdoing, does not abrogate its duty to investigate the Demand's allegations. The Board thus failed in its legal obligation to investigate the Demand.

200.    Further, the argument that the Securities Class Action's allegations are "without merit" is false as it is absurd. The Board knew that Judge Ebel had already determined the merit of those allegations in denying the Securities Class Action defendants' motion to dismiss, and he did so even under heightened pleading standards. The denial of the motion to dismiss in the Securities Class Action was not properly considered by the Board, showing that its rejection of the Demand was unreasonable and not in good faith.

201.    Additionally, the Board's consideration of the Demand was not objective and was tainted by virtue of its reliance on Beha, who lacked independence. Beha represents Farmland Partners and the defendants in the Securities Class Action, including defendants Pittman and Fabbri. As such, he has committed himself to zealously arguing that many of the facts underlying the Securities Class Action are without merit. Beha is aware that his continued representation of the Company and any future representation depends upon staying in the good graces of defendants

- 70 -

Pittman and Fabbri. Accordingly, Beha could not, and did not, recommend pursuing the Demand because he knew that defendants Pittman and Fabbri were likely targets.

202.    The Board was well aware that Beha represents Farmland Partners and defendants Pittman and Fabbri in the Securities Class Action. Yet, the Board failed to retain independent counsel so that it could conduct a reasonable and objective investigation into the Demand. The Board also failed to isolate tainted directors from decision-making ability, namely defendant Pittman and the members of the Audit Committee, defendants Downey, Bartels, and Glauber— each of whom faces liability for approving the improper statements detailed herein. Out of the five current members of the Board, the only possible independent director remaining was defendant Good. Accordingly, the Board's refusal of Plaintiff's Demand was not the result of an independent and fully informed business decision made in good faith. Rather, it is entirely consistent with a Board that was concerned with its own liability and protecting those of its friends, the officers of the Company. As such, the Board's refusal of the Demand was wrongful, was not reasonable, was a decision made in bad faith, and is not entitled to the protections of the business judgment rule and likewise warrants that this action proceed.

203.    Plaintiff has not made any demand on the other stockholders of Farmland Partners to institute this action since such demand would be futile and useless for at least the following reasons:

(a)    Farmland Partners is a publicly held company with over thirty-one million shares of common stock outstanding and thousands of stockholders;

(b)    making a demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making a demand on stockholders would force Plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

204.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

205.    During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Farmland Partners, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

206.    While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to defendants' false or misleading statements. The Director Defendants engaged in a scheme to defraud Farmland Partners by causing the Company to repurchase $16.5 million in shares of its stock at artificially inflated prices.

207.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon

Farmland Partners in connection with the Company's purchases of its stock during the period of wrongdoing.

208.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Farmland Partners stock, which were intended to, and did: (a) deceive Farmland Partners and its stockholders regarding, among other things, the FPI Loan Program, related-party loans, financial results, and future prospects; (b) artificially inflate and maintain the market price of Farmland Partners stock; and (c) cause Farmland Partners to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, defendants were in possession of material, nonpublic information regarding the above.

209.    The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as alleged above.

210.    As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that defendants

should have been aware of them. Throughout the period of wrongdoing, defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

211. The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock by Farmland Partners.

212. As a result of the Individual Defendants' misconduct, Farmland Partners has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

213. Farmland Partners would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

214. As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Farmland Partners' stock during the period of wrongdoing. By reason of such conduct, defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

215. Plaintiff brings this claim within two years of his discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

**Against the Individual Defendants for Breach of Duty Owed to Farmland Partners**

216. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

217. The Individual Defendants, by reason of their positions in the Company, owed and owe Farmland Partners certain obligations and duties respective to their positions as officers and directors of the Company. By reason of their fiduciary relationships, the Officer Defendants were

#3370848v.1

and are required to exercise reasonable care, and owed and owe Farmland Partners the highest obligation of good faith, fair dealing, loyalty, and candid disclosure. The Director Defendants, as directors of the Company, are and were required to act in good faith, in a manner the director reasonably believes to be in the best interests of the Company, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

218.    The Individual Defendants and each of them, violated their duty to act in good faith. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Farmland Partners, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

219.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Individual Defendants were using the FPI Loan Program to issue loans to related parties, not "third-party farmers"; (ii) these related-party loans were issued without properly vetting the borrower's ability to pay, were not negotiated at arm's-length, reflected more lenient underwriting standards than those with third parties, and presented increased risks beyond those traditionally associated with being a lender; (iii) the Company failed to disclose the loans to Niebur and Hough as related-party transactions, as was required; (iv) Farmland Partners was inflating its revenue and earnings by issuing these loans to related-party tenants who would then circle the money back to the Company in the form of rent payment; and (v) as a result of the foregoing, Farmland Partners' statements concerning the Company's financial results and future prospects, compliance with GAAP, and effectiveness of its internal controls were improper.   Accordingly, the Officer Defendants breached their duties of care, loyalty, and candid disclosure to the Company.

220.    The Director Defendants, as directors of the Company, owed Farmland Partners duties to act in good faith, in a manner the director reasonably believes to be in the best interests of the Company, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.   These defendants failed to act in good faith or exercise sound business judgment by causing or permitting the improper activities detailed herein.   The Director Defendants knew or were reckless in not knowing that: (i) the Individual Defendants were using the FPI Loan Program to issue loans to related parties, not "third-party farmers"; (ii) these related-party loans were issued without properly vetting the borrower's ability to pay, were not negotiated at arm's-length, reflected more lenient underwriting standards than those with third parties, and presented increased risks beyond those traditionally associated with being a lender; (iii) the Company failed to disclose the loans to Niebur and Hough as related-party transactions, as was required; (iv) Farmland Partners was inflating its revenue and earnings by issuing these loans to related-party tenants who would then circle the money back to the Company in the form of rent payment; and (v) as a result of the foregoing, Farmland Partners' statements concerning the Company's financial results and future prospects, compliance with GAAP, and effectiveness of its internal controls were improper.   Accordingly, these defendants failed to exercise the standard of care that they owed to the Company.

221.    The Audit Committee Defendants failed to act in good faith or exercise sound business judgment by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

222.    Each of the Individual Defendants also failed to act in good faith and with appropriate care by causing or allowing Farmland Partners to repurchase its stock on the open market at prices the Individual Defendants knew were artificially inflated by their misleading statements and omissions.

223.    As a direct and proximate result of the Individual Defendants' breaches of duties and obligations, Farmland Partners has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

224.    Plaintiff, on behalf of Farmland Partners, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

225.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

226.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by issuing loans to related parties that were unfavorable and ultimately detrimental to the Company.

227.    As an additional result of the misconduct described herein, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper statements.

228.    In addition, the Individual Defendants have caused Farmland Partners to waste its assets by causing or allowing the Company to repurchase its stock at significantly artificially inflated prices.

229.    Finally, as a result of the decision to allow the Company to operate in an environment devoid of adequate internal controls, the Individual Defendants have caused Farmland Partners to waste its assets by paying improper compensation and bonuses to certain of

#3370848v.1

its executive officers and directors that breached their fiduciary duty or failed to act with the required standard of care.

230.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

231.    Plaintiff, on behalf of Farmland Partners, has no adequate remedy at law.

### COUNT IV

**Against the Individual Defendants for Unjust Enrichment**

232.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

233.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Farmland Partners.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching the duties they owed to Farmland Partners.

234.    Plaintiff, as a stockholder and representative of Farmland Partners, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and breaches of duties.

235.    Plaintiff, on behalf of Farmland Partners, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Farmland Partners, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of duties, waste of corporate assets, and unjust enrichment;

#3370848v.1

B.      Directing Farmland Partners to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Farmland Partners and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's internal controls and Board oversight concerning related-party transactions;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a proposal to strengthen Farmland Partners' oversight of its disclosure procedures;

4.      a proposal to strengthen the Board's oversight with respect to stock repurchases;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

6.      a provision to permit the stockholders of Farmland Partners to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Farmland Partners has an effective remedy;

D.      Awarding to Farmland Partners restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 1, 2019                    TYDINGS & ROSENBERG LLP

                                          John B. Isbister (Federal Bar No. 00639)
                                          Email: jisbister@tydingslaw.com
                                          Daniel S. Katz (Federal Bar No. 01148)
                                          Email: dkatz@tydingslaw.com
                                          One East Pratt Street, Suite 901
                                          Baltimore, MD 21202
                                          Telephone: (410) 752-9700
                                          Facsimile: (410) 727-5460

                                          *Counsel for Plaintiff*

ROBBINS ARROYO LLP

Brian J. Robbins
Email: brobbins@robbinsarroyo.com
Craig W. Smith
Email: csmith@robbinsarroyo.com
Steven R. Wedeking
Email: swedeking@robbinsarroyo.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

- 80 -

Case 8:19-cv-02882-TDC   Document 1   Filed 10/01/19   Page 81 of 82

PROMISLOFF LAW, P.C.
David M. Promisloff
Email: david@prolawpa.com
5 Great Valley Parkway, Suite 210
Malvern, PA 19355
Telephone: (215) 259-5156
Facsimile: (215) 600-2642

*Of Counsel for Plaintiff*

#3370848v.1

<u>VERIFICATION</u>

I, Shawn Luger, hereby declare as follows:

I am the plaintiff in this action.   I have read the Verified Stockholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 9/27/2019

SHAWN LUGER